·Mrs. Lillie D. Pritchett *v.* Thomas Plater & Co., *et al.*

(*Nashville,* December Term, 1920.)

1. **INSANE PERSONS.** Evidence held to show party to sale of corporate stock insane.

Evidence *held* to show that an owner's mental condition was such as to render him incapable of making a valid contract, and that such condition was so pronounced as to be apparent to any one dealing with him. (*Post, pp.* 422-432.)

2. **INSANE PERSONS.** Judgment of insanity held prima-facie evidence thereof at date of sale of stock owned by insane person.

A judgment declaring a person insane is conclusive evidence thereof at the date of the judgment, and *prima-facie* evidence of such fact from the time the jury found him to have become insane until the date of the judgment, so that where, during such period, stock owned by him jointly with another was sold by the latter in their joint behalf, such judgment was *prima-facie* evidence of his insanity when the sale was made. (*Post, pp.* 422-432.)

Case cited and approved: Bond v. State, 129 Tenn., 75.

3. **INSANE PERSONS.** Contract prior to adjudication of insanity and appointment of guardian is voidable.

The contract of an insane person made prior to an adjudication of his insanity and the appointment of a guardian is voidable. (*Post, p.* 432.)

4. **INSANE PERSONS.** Contracts after adjudication of insanity void.

A contract by an insane person after he has been regularly adjudged insane is absolutely void, the inquisition of insanity being regarded as notice, actual or constructive, to all the world of the fact of insanity. (*Post, p.* 432.)

5. **INSANE PERSONS.** Contracts in good faith, wholly or partly executed, not set aside without restoration.

Where a contract with an insane person has been entered into in

Pritchett v. Plater & Co.

good faith, without fraud or imposition, for a fair consideration, without notice of the infirmity and before an adjudication of insanity, and has been executed in whole or in part, it will not be set aside unless the parties can be restored to their original position. (*Post, p.* 432.)

6. **INSANE PERSONS.** Contract by one knowing of insanity may be set aside for fraud.

A contract with an insane person, by one having knowledge of his incapacity, may be set aside on the ground of fraud. (*Post, pp.* 432-434.)

7. **INSANE PERSONS.** Knowledge leading prudent person to believe other party of unsound mind avoids contract.

Knowledge or information such as would lead a prudent person to believe that the other party to a contract is of unsound mind is such evidence of bad faith as will avoid the contract. (*Post, pp.* 432-434.)

Case cited and approved: Bank v. Sneed, 97 Tenn., 120.

8. **PARTNERSHIP.** General nature of "partnership" defined.

A partnership is a voluntary contract of two or more competent persons to place their money, effects, labor, and skill in lawful commerce or business, and to divide the profit and bear the loss in certain proportions. (*Post, pp.* 434, 435.)

Cases cited and approved: McMurtrie v. Guiler, 183 Mass., 451; Carter v. McClure, 98 Tenn., 109; Mallory v. Oil Works, 86 Tenn., 598.

9. **PARTNERSHIP.** Created by voluntary agreement, not by operation of law.

A partnership, as between the parties, is always created by a voluntary agreement of the parties, and not by operation of law alone. (*Post, p.* 435.)

10. **PARTNERSHIP.** Agreement to share profits implies agreement to share losses.

An agreement to share profits *prima-facie* implies an agreement to share losses. (*Post, pp.* 435, 436.)

Cases cited and approved: Gavin v. Walker, 82 Tenn., 645, 646; Johnson Bros. v. Carter, 120 Iowa, 355; Ruggles v. Buckley, 158 Fed., 950; Huggins v. Huggins, 117 Ga., 151.

11. **PARTNERSHIP.** Unnecessary to creation of partnership that it be called such.

It is unnecessary to the creation of a partnership that it be called by that name, it being sufficient that the partners by contract combined their property, labor, and skill as principals for the purpose of joint profits. (*Post*, *p.* 436.)

Cases cited and approved: Fougner v. First Nat. Bank, 141 Ill., 124; Beecher v. Bush, 45 Mich., 188; King v. Remington, 36 Minn., 15; Fairly v. Nash, 70 Miss., 193; McDonald v. Campbell, 96 Minn., 87; Corey v. Cadwell, 86 Mich., 576.

12. **PARTNERSHIP.** Contract binding, though signed with individual names, when given in firm transaction and intended as firm obligation.

A written contract is binding on a partnership, though signed with the individual names of the partners instead of the firm name, when given in a firm transaction and intended as a firm obligation. (*Post*, *p.* 436.)

13. **PARTNERSHIP.** Either partner may dispose of partnership property for benefit of firm.

Either partner may dispose of partnership property for the benefit of the firm. (*Post*, *p.* 437.)

Case cited and approved: Whitman v. Insurance Co., 82 Tenn., 335.

14. **PARTNERSHIP.** May exist for single transaction.

A partnership may exist for a single transaction, venture, or undertaking. (*Post*, *p.* 437.)

15. **JOINT ADVENTURES.** Similar to partnership and governed by same rules.

A joint adventure is similar to a partnership and governed by the same rules. (*Post*, *p.* 437.)

Pritchett v. Plater & Co.

Cases cited and approved: Slater v. Clark, 68 Ill. App., 433; Doane v. Adams, 15 La. Ann., 350; Chester v. Dickerson, 54 N. Y. 1; Marston v. Gould, 69 N. Y. 220; Ross v. Willett, 76 Hun., 211.

16. **PARTNERSHIP.** Persons contracting to buy stock on joint account and share the profits are partners.

A contract of two individuals to buy gas stock on a joint account, they to share in the profits equally, constitutes the community of interest necessary to make the venture a partnership. (*Post, pp.* 437, 438.)

17. **PARTNERSHIP.** Sale by one partner in good faith binding on other, notwithstanding latter's insanity.

A good-faith sale of stock belonging to a partnership by one of the partners by agreement of both, to discharge a firm indebtedness, is valid and binding on the other, notwithstanding his insanity at the time of the sale. (*Post, pp.* 438-440.)

### On Rehearing.

18. **PARTNERSHIP.** Insanity of partner does not per se dissolve partnership.

The insanity of a partner does not *per se* work a dissolution of the partnership, but may constitute sufficient grounds to justify a court of equity in decreeing its dissolution. (*Post, pp.* 440-442.)

Case cited and approved: Isler v. Baker, 25 Tenn., 815.

Case cited and distinguished: Raymond v. Vaughn, 128 Ill., 256.

19. **PARTNERSHIP.** Mere knowledge by one dealing with partnership of insanity of partner does not effect dissolution.

Mere knowledge, actual or constructive, by one dealing with a partnership, of the insanity of one of the partners, does not effect a dissolution of the partnership so far as he is concerned. (*Post, p.* 442.)

20. **PARTNERSHIP.** Evidence held to show seller of partnership stock acted as partner and that buyer dealt with him as such.

In an action to set aside a sale of stock belonging to a partnership, on the ground of insanity of one of the partners, evidence *held* to

show that a sale was contemplated by the partners prior to such insanity, that the one selling the stock assumed to act as a partner, and that the buyer dealt with him as such. (*Post, pp.* 442, 443.)

21. **PARTNERSHIP.** Each partner considered agent of the firm and as such may bind other partners as though acting under power of attorney. (*Post, p.* 444.)

Each partner is considered generally as agent of the firm in all matters pertaining to its business, and as such may bind the other partners as though he acted under a duly executed power of attorney. (*Post, p.* —.)

Cases cited and approved: Schneider v. Sansom, 62 Tex., 201; Blodgett v. Weed, 119 Mass., 215; Decker v. Howell, 42 Cal., 636; Campbell v. Dent, 54 Mo., 325; Pahlman v. Taylor, 75 Ill., 629; Kenney v. Altvater, 77 Pa., 34.

22. **PARTNERSHIP.** One partner may sell assets of firm for purpose of paying debts, in absence of fraud.

One partner may sell the whole or any part of the assets of the firm in the regular course of business, or for the purpose of paying the firm's indebtedness, when there is no fraud in the sale. (*Post, pp.* 444, 445.)

Cases cited and approved: Williams v. Roberts, 46 Tenn., 493; Schneider v. Sansom, supra; Graser v. Stellwagen, 25 N. Y., 315; Williams v. Barnett, 10 Kan., 455; Halstead v. Shepard, 23 Ala., 558; Cayton v. Hardy, 27 Mo. 536; Arnold v. Brown, 24 Pick. (Mass.), 89; Lamb v. Durant, 12 Mass., 54.

23. **INSANE PERSONS.** Guardian of insane partner on setting aside sale of partnership stock may recover market value thereof at time of trial less price paid by purchaser.

In an action to set aside a sale of stock owned by a partnership on the ground of the insanity of one of the partners, complainant, as guardian of the insane partner, could recover the stock in specie; but having elected to recover its value less the price paid by defendant for it, she was not limited to the difference between the sale price and the highest market price at any time within a rea-

sonable period after having notice of the sale, but could recover on the basis of the market value of the stock at the time of the trial, the object being to restore the *status quo* of the parties. (*Post, p.* 445.)

FROM DAVIDSON

Appeal from the Chancery Court of Davidson County —HON. JOHN T. LELLYETT, Chancellor.

VERTREES & VERTREES and A. W. STOCKELL, JR., for appellant.

PITTS & McCONNICO, for appellant.

MR. JUSTICE HALL delivered the opinion of the Court.

This appeal involves the validity of the sale of certain stock in the Nashville Gas Company, owned jointly by A. W. Stockell and Samuel Pritchett (husband of complainant), and also some stock owned by the said Samuel Pritchett individually, to the defendant Thomas Plater & Company (a banking and brokerage corporation) doing business in the city of Nashville, Tenn., on June 21, 1911.

The stock in question consisted of seven hundred and fifty-eight and four tenths shares owned by Pritchett and Stockell jointly, or as partners, each owning an undivided one-half interest in the same, and one hundred and eleven shares owned by Pritchett individually.

The bill was filed by complainant on April 27, 1912, as guardian of her husband, who had been declared insane

in a lunacy proceeding regularly had on April 25, 1912, seeking to have said sale set aside, in so far as the one-half undivided interest of her ward was concerned in the joint or partnership stock, and the one hundred and eleven shares owned by him individually, upon the ground that her ward was insane at the time of the sale and lacked mental capacity to make a valid and binding contract, which fact was known to defendant's officers, who negotiated the purchase on behalf of defendant, or could have been known to them by the exercise of ordinary diligence.

The bill alleged that the stock was worth $105 per share, while the defendant only paid $80 per share for the entire purchase; that complainant was entitled, on behalf of her ward, to recover this stock in specie; but that she did not desire to visit upon defendant any undue hardship or injustice, and was therefore willing and offered to refund to defendant the consideration paid for said stock, either in cash, or by crediting said consideration upon any legal and valid indebtedness which her ward owed defendant at the time of said sale; that in default of the return to her by defendant of said stock in specie she was entitled to recover of defendant its present value, including any dividends collected and interest, less the sums paid on, or applied to, the discharge of valid and *bona-fide* debts of her ward. And the bill prayed accordingly.

Defendant answered the bill. It denied:

(1) That complainant's ward was insane at the time of the sale to defendant, or that he lacked mental ca-

pacity to make the sale, but possessed mental capacity to make a valid and binding contract.

(2) That even if complainant's ward did not have sufficient mental capacity to make the sale, his incapacity was not known to defendant's officers, who negotiated the purchase of said stock, nor was it apparent to those who knew and dealt with him.

(3) That complainant's ward and Mr. A. W. Stockell were partners as to the seven hundred and fifty-eight and four tenths shares of gas stock, the sale of which was, in fact, negotiated and made by said Stockell to defendant, and that Stockell, as a partner in said stock, had the legal authority to make said sale and bind complainant's ward, notwithstanding his mental incapacity.

(4) That the price paid was a fair and full price, and was several dollars per share above the market, and the transaction was in all respects fair and open, and made with buyers who stood in no fiduciary relation.

(5) That the sale was made to pay debts owing by complainant's ward created at a time when he was capable and sane, and it was a sale of stock pledged when the debts were incurred to secure the payment of same, and held continuously thereafter by the owners and holders of the notes, for the payment of which the stock stood pledged, and no prejudice resulted to complainant's ward by reason of said sale.

Upon the hearing the chancellor decreed in complainant's favor, adjudging that complainant was entitled to recover of defendant the net sum received by defendant for all of said stock, at $105 per share, with interest from date received, and the dividends collected thereon

by defendant, with interest, less all the payments and expenditures made by defendant to or for her said ward, with interest from dates paid, including a note for $794.15, and an item of mistake shown of $274.99, the total recovery amounting to $17,732.37.

From this decree the defendant Plater & Co. have appealed to this court, and have assigned errors, and seek a reversal of the chancellor's decree.

It appears from the evidence that Samuel Pritchett (complainant's ward) died in the year 1915, at the age of sixty-five. He resided in the city of Nashville at the time of his death, having resided in said city all of his life. He and complainant were married in the year 1881. In the year 1907 he had become the owner of five hundred and fifty or six hundred shares of stock of the Nashville Gas Company, which was of the par value of $100 per share. He had also been connected with the management of the gas company for a number of years, but was dismissed by one D. Shelby Williams when he became president of that company. This Mr. Pritchett felt keenly and resented. It also appears that the dividends of the gas company were reduced to three per cent. under Mr. Williams' administration. This also Mr. Pritchett disapproved, and he began the prosecution of a plan to secure the election of a board of directors that would favor and make an increase in the dividends of the company.

Mr. A. W. Stockell, a member of the Nashville bar, and a gentleman of standing and integrity, who represented the Cooper interest in the gas company, and controlled and looked after the stock in that company, which

passed to the legatees under the will of Judge Wm. F. Cooper, deceased, also disapproved of the reduction in dividends by the Williams administration. Mr. Stockell and Mr. Pritchett were intimate friends, and in 1908 they agreed that they would purchase enough stock in the gas company, together with their own holdings and the holdings of other friendly stockholders, to control the next election, and to elect a board of directors that would increase the dividends.

Pursuant to this plan, on January 2, 1908, they entered into the following agreement:

"Nashville, Tennessee, January 2, 1908.
"This is to witness that Samuel Pritchett and A. W. Stockell have agreed to buy Nashville Gas Company stock on a joint account, executing their joint notes for the amounts of purchase money with the purchased stock attached as collateral, and where additional collateral is required the said Pritchett provides this and this additional stock is to be returned to him upon payment of the notes to which it is attached. Such profit as is made on the purchased stock is to be equally divided between us.

" [Signed]                "A. W. Stockell.
                          "Samuel Pritchett.
                                 "January 15, 1910.


"Up to the present time we have bought of gas stock under above agreement six hundred and thirty-two shares, of which four hundred and thirty-two shares stand in the name of Thomas Plater & Company, one

hundred shares in the name of Goulding Marr, and one
hundred shares in the name of A. W. Stockell.

"[Signed]                    "A. W. STOCKELL.

"SAMUEL PRITCHETT."

The first purchase of stock in the gas company, made
by Stockell and Pritchett under this agreement was made
on November 25, 1908, and the last purchase by them
was made on January 15, 1910. Their purchases were
in accordance with the provisions of the agreement.
While Mr. Stockell attended to making most of the pur-
chases, when they executed notes each partner signed his
own name thereto. They had no firm name, and the
agreement expressly provided that they should execute
their joint notes. They purchased sufficient stock to get
control of the management of the company, and they,
with the co-operation of other friendly stockholders,
elected a new board of directors; but it appears that
when the new board took possession of the company's
affairs and investigated its condition they, too, refused
to increase the dividends. This action upon the part of
the new board of directors resulted in Stockell and
Pritchett losing the particular thing they had set about
to secure, and their situation was this: They owed over
$60,000 for stock purchased, to secure the payment of
which all the stock they had purchased and two hundred
and twenty-six shares additional of Mr. Pritchett's in-
dividual stock was pledged to secure said indebtedness.
Furthermore, this large indebtedness was being carried
at an interest rate twice as large as the dividends that
were being declared by the gas company. The result
was that Stockell and Pritchett set about to sell their
stock and liquidate their indebtedness.

In May, 1911, Mr. Stockell approached defendant with a proposition to sell their holdings in the gas company, which then amounted to one thousand shares. The defendant, on May 29, 1911, took from Mr. Stockell an option on one thousand shares of gas stock at the price of $80 per share, good until the 10th day of June, 1911. The option provided that upon the failure of said Thomas Plater & Co. to demand, receive, and pay for said stock by noon on the 10th day of June, 1911, the option was to be null and void.

It also appears that Mr. Pritchett executed a written authorization on May 22, 1911, authorizing Mr. Stockell to sell to defendant at $80 per share the stock owned by them jointly, and also agreed that Stockell might sell to defendant at the same figure seventy-five shares of his individual stock, which was then held by defendant as collateral to a note which Stockell owed the defendant for $6,000, and apply the proceeds of said individual stock to the payment of said note.

This option was not exercised by defendant, but was allowed to expire; but within a few days after the expiration of said option defendant concluded that it would acquire the stock owned by Stockell and Pritchett, and also other stock, with a view of organizing a syndicate and getting control of the gas company.

Mr. Joseph Thompson, president of the Nashville Trust Company, who was friendly to the plan of defendant agreed to take one-half of the stock to be purchased of Stockell and Pritchett. Defendant did purchase the shares of stock from Mr. Stockell on June 21, 1911 as

144 Tenn.—27

before stated.    The contract of sale · is in words and figures as follows:

"Nashville, Tenn., June 21, 1911.

"I, A. W. Stockell, have this day sold to Thos. Plater & Co. one thousand shares Nashville Gas Co. stock above mentioned at $80 per share net, the said stock carrying, all and any dividends payable July, 1911.   If any is delivered thereafter, then the amount of dividend is to be deducted from price of each share to be paid for.

"I furthermore agree to deliver any remaining undelivered balance of the one thousand shares not later than July 15th.

"A. W. STOCKELL.

"We, Thos. Plater & Co., agree to pay for the above stock upon delivery $80 per share net to A. W. Stockell.

"Witness our signature this 21st day of June, 1911.

"THOS. PLATER & Co.,

"BY R. C. PLATER.

"Signed in duplicate."

At the time this sale was negotiated by Mr. Stockell to defendant Mr. Pritchett was at his country home in Maury county, Tenn., having gone there for the summer with his family.   He was notified, however, of the sale by Mr. Stockell, and returned to Nashville on June 22d, the day following the sale, and was present when the transaction was finally closed, which was done by the defendant crediting the joint notes of Stockell and Pritchett with the proceeds of the joint or partnership stock, after which there remained due the defendant from Stockell and Pritchett the sum of $778.31, for which a note was executed by Stockell and Pritchett to defend-

ant, and thirteen shares of the individual stock of Mr. Pritchett were pledged to defendant to secure its payment. The remainder of Mr. Pritchett's individual stock, which he had from time to time placed with defendant under his contract with Stockell to secure the joint notes of Stockell and Pritchett, consisting of two hundred and twenty-six shares, was returned to him, together with the sum of $1,640, surplus of the proceeds of the sale of Mr. Pritchett's ninety-eight individual shares, which remained after the satisfaction of a $6,000 note with interest, due defendant.

It is conceded that all of 'this indebtedness which Stockell and Pritchett owed defendant jointly, as well as that which Pritchett owed individually, and to secure which defendant held said stock as collateral, was incurred and created prior to the date it is claimed Mr. Pritchett became insane, which was on October 25, 1910. While all of the notes, which were paid by the sale of the stock in June, 1911, were executed subsequent to October 25, 1910, they were renewals of the notes executed prior to that date, and stood on the same footing as the originals. It is not disputed that the price paid by the defendant for the stock at that time was a fair and full price; in fact, the evidence shows that the price paid was slightly above the prevailing market price.

It appears from the evidence that the notes, for which the stock was held as collateral by the defendant stipulated that the holder, upon maturity and nonpayment, should have the power to sell the collateral, either publicly or privately, without notice to the payor or payors.

The evidence shows that the joint note of Stockell and Pritchett for $778.31 was not paid at maturity, and ten of the thirteen shares of individual stock of Mr. Pritchett, which were pledged as collateral to this note, were sold by defendant without notice to satisfy said note, leaving three of said thirteen individual shares unsold, which shares were being held by the defendant subject to Mr. Pritchett's order at the time the bill in this cause was filed.

After the bill was filed, however, a stipulation was entered into by the parties by which the defendant should execute and deposit with the Nashville Trust Company its demand note for $12,500, with interest, indorsed by R. C. Plater and Joe B. Palmer, payable to the Nashville Trust Company, and held by the Nashville Trust Company as security for any decree which might be finally rendered in favor of complainant in this cause, such note to be subject to the order of the court in this cause in its final decree, and that upon such note being executed all claim of complainant to said stock should be released and discharged. This stipulation was made in view of the fact that defendant had theretofore contracted to sell said stock to certain parties interested in the organization of a new gas company known as the Nashville Gas & Heating Company, and who were buying up the stock of the Nashville Gas Company.

It further appears that within a few days after the purchase of the stock in question by the defendant in June, 1911, certain people, known as the Geist Syndicate, appeared in Nashville, and made a proposition to buy Nashville gas stock at $105 per share. The purpose of

the Geist people was to get control of the Nashville Gas Company, and ultimately reorganize that company, and in order to get control of enough stock to carry out this project they were willing to pay $105 per share, on condition that the city of Nashville would grant the new company a franchise for a period of forty years, and options on stock in the gas company were taken by the Geist Syndicate with this condition attached, and the stock was to be accepted and paid for by the Geist Syndicate at said price, and on the condition above named; but before a franchise could be granted by the city of Nashville to the new company it was necessary to hold an election and take a vote upon the question. An election was called and held in the city of Nashville for the purpose of determining this question on April 15, 1912, the result of the election was favorable to granting the franchise, and the stock, for the sale of which the Geist Syndicate had taken options, was finally acquired for the price named. In this purchase was included the stock which defendant had purchased from Stockell and Pritchett. It appears, however, that none of the parties connected with the sale of the stock in question knew of the Geist proposition at the time of the sale in June, 1911, and defendant's purchase was not in any manner influenced or induced by that proposition.

The evidence further shows that Mrs. Pritchett did not learn of the sale of the stock in question until the 28th or 29th of June, 1911. Nor did she, in fact, know that her husband and Mr. Stockell had been purchasing stock in the Nashville Gas Company until about that date. Upon learning the particulars of the sale, Mrs. Pritchett

demanded, on behalf of her husband, that his stock be returned to him, including his undivided one-half interest in the joint or partnership stock owned by Stockell and Pritchett. This defendant first agreed to do, and Mrs. Pritchett then made arrangements to secure the money and refund to defendant what it had paid for the stock including costs and interest; but finally defendant refused to rescind the sale and return the stock, and the present bill was filed, but not until after the Geist proposition had carried in the election held in April, 1915.

It appears from the evidence that in the early morning of October 25, 1910, before the sale was made to defendant in June, 1911, Mr. Pritchett had "a stroke" at his home on Eighth avenue in the city of Nashville, which proved to be paresis—a disease which is described to be an organic disease of the brain structure—which, though slow in its progress, culminated in Mr. Pritchett's death in October, 1915. Up to this time it is conceded that Mr. Pritchett was in possession of his mental faculties; but it is claimed by complainant that after this stroke he lacked sufficient mental capacity to understand and transact business or make a valid and binding contract, and a large volume of evidence was introduced by complainant upon the hearing in the court below to establish this fact.

While countervailing evidence was offered by the defendant upon this question, we are of the opinion, after a careful reading of the evidence, that its weight establishes that Mr. Pritchett's mental condition was such, at the time of the sale to defendant in June, 1911, as to render him incapable of making a valid and binding contract, and that his mental condition was so pronounced

at that time to be apparent to a person dealing or transacting business with him. Without undertaking to set out in detail the evidence which supports this conclusion, we do set out some of the most salient facts in support of it.

As before stated, *paresis*, from which Mr. Pritchett suffered, is an organic disease of the brain structure, which gradually but surely destroys or greatly impairs the subject's mental faculties. It is incurable, and though the subject may live for from two to three years, death is inevitable. There are, however, exceptions to the general rule as to the duration of the disease. Mr. Pritchett lived for more than four years after the stroke in 1910.

On April 25, 1912, before his death, Mr. Pritchett was declared insane in a regular inquisition proceeding had for that purpose, the jury finding that he had been insane since October 25, 1910, and incapable of caring for himself and property, and judgment was accordingly entered in the county court of Davidson county, and complainant was appointed guardian for him.

This judgment, according to the rule announced by this court in *Bond* v. *State*, 129 Tenn., 75, 165 S. W., 229, which we think is in accord with the weight of authority, is conclusive evidence of Mr. Pritchett's insanity at the date of the judgment, and *prima-facie* evidence of his insanity during the intervening period from October 25, 1910, and is, therefore, *prima-facie* evidence of his insanity in June, 1911, when the sale in question was made.

Mr. Pritchett suffered the stroke hereinbefore referred to between two and three o'clock of the morning of

October 25, 1910, at the family residence. He and his little son, Joe, were sleeping in a room separate from that of his wife and daughter. Mrs. Pritchett was aroused from her slumbers by the screams of the son, who called her and said, "Papa is falling all over himself, does not know anything." ·She says that she went to them and that her husband had the most "awful vacant stare" she had ever seen, one side of his mouth was dropped, and that he seemed not to know what he was doing, and said, "I have the strength of ten men," and began to. try to climb over the top of the bed; that he would rise and then fall, and finally got so he could not move at all. ·She called·Dr. McGannon, and he came within twenty minutes. She says that she tried to arouse her husband, and asked him if he knew his little boy, and he said, "I have no little boy;" that he knew nothing and was perfectly vacant; that the doctor attended him for two or three days after which he dismissed him. She says that after this stroke he became very irritable, complained of a pain in the back of his head, and was very abusive to the children—nothing could please him; that before the stroke he had never been cross in his life, but always courteous and kind to members of·his family. She says that after this stroke he was unable to grasp a conversation for any length of time—was flighty and changeable; that his habit of dress changed from that of being one of the most tidy and neat persons to one of the most careless in every way, both in his person and in his room; that on one occasion he burned the hair brush, saying that it shocked his nerves. Mrs. Pritchett further says that on one morning soon after the stroke

she went in her husband's room and he was covered with purple ink; that there was ink on the bedclothes and other articles in the room, and he was unable to give any account as to how this occurred. She says that after the stroke he had a way of laughing at most everything that was said, and would laugh when there was no occasion to do so, and could make no intelligent replies to questions.

Mrs. Pritchett says that in March, 1911, the little son, Joe, had diphtheria and was very ill; that Mr. Pritchett did not want her to send for a physician, and told her that if she did call a physician he would curse him out before he should come in the house—told her that he would cure the child himself. Mrs. Pritchett did call Dr. Owen Wilson, told him of her husband's condition, and told Dr. Wilson not to pay any attention to what her husband said, but to prescribe for the child regardless of what he said, and he did so.

It is shown that Mr. Pritchett, being obsessed with the idea that he could cure the child, went to a drug store nearby and secured some kind of a chemical, which he placed in a vessel of water under the bed in the little boy's room, and closed the door, and refused his wife admittance. She called the druggist and asked him about the chemical, and the druggist informed her that it was not suitable for the purpose for which Mr. Pritchett was using it, and told her it would endanger the little boy's life. She finally succeeded in getting her husband to open the door, and she took the little boy in her arms and carried him into another room and did not leave him alone with the defendant after that time.

Dr. Owen Wilson testified that, while he was visiting the little son, Mr. Pritchett would turn the gas jets on and burn gas in the daytime and would keep the water running. Dr. Wilson gave it as his opinion that Mr. Pritchett was of unsound mind at that time, and was incapable of understanding and transacting any sort of business.

To the same effect is the testimony of Dr. McGannon, who says that when he saw Mr. Pritchett on the morning of October 25, 1910, he was in a dazed condition and seemingly suffering from an "apoplectic form of attack." He gave it as his opinion that this attack was due to general paresis. He says he saw Mr. Pritchett a good many times after that, but not in a professional capacity; that after Mr. Pritchett recovered from the attack which was the occasion of Dr. McGannon's visit, so he could go about town, Mr. Pritchett would frequently come to his office when he was not in, and that Mr. Pritchett would wait for his return and would complain because he (McGannon) had not kept his engagement with him, when, in fact, he had no engagement with Mr. Pritchett. Dr. McGannon says that he was not treating Mr. Pritchett at that time and did not consider him his patient. He says that Mr. Pritchett would use obscene language around the office in the presence of the office girl, and she would complain about it. He says on one occasion he met Mr. Pritchett in the hall and spoke to him, after which he (McGannon) went into his private office, and in a few minutes afterwards Mr. Pritchett wanted to know, with an oath, why he did not keep his appointments, saying that he had an appointment with

him that day, when, in fact he had no appointment with Mr. Pritchett. Dr. McGannon says that Mr. Pritchett made visits to his office at intervals for a month after the stroke, and, upon each occasion that he saw him at his office, he says he considered Mr. Pritchett as being demented, and that his mental condition was such that he was incapacitated to attend or to transact business.

While, as before stated, we cannot undertake to detail the testimony of the large number of witnesses introduced by complainant to establish Mr. Pritchett's insanity dating from the stroke in October, 1910, down to the date of the sale to defendant in June, 1911, and subsequent to that time, we think the weight of the evidence shows that his mental condition grew gradually worse from October 25, 1910, and at the date of the sale of the stock to defendant he was incapable of comprehending and conducting an ordinary business transaction. The evidence shows that his wife removed with him to their country home in Maury county on June 15, 1911, before the sale to defendant was consummated on June 21, 1911.

It is shown by the testimony of Mr. W. E. Jones, a neighbor, who lived only a mile and a half from the Pritchett home in Maury county, that he had known Mr. Pritchett since 1888, and had lived a neighbor to him when he and his family were at their country home for twenty-five years. He says he saw Mr. Pritchett within a few days after they reached their summer home in the summer of 1911; that he was passing the house and Mr. Pritchett was out about the front gate and got in the buggy with him and drove to Ashwood, a mile and a half

distant. He says he talked with Mr. Pritchett on this occasion for something like an hour, and could not keep him "straight" on any one subject—that he (Pritchett) "was jumping from limb to limb and seemed flighty;" that he could not carry on an intelligent conversation, and, in his opinion, he did not have sense enough to feed his (Jones') calves at that time. He says he thought Mr. Pritchett a fit subject for the asylum and so told his (Jones') wife afterwards. He says that, in his opinion, Mr. Pritchett was incapable of transacting business of any sort at that time.

Mr. J. O. Walker, another neighbor, who lived at Ashwood, only a mile and a half from Mr. Pritchett's country home, and is in the milling business, testified that he had known Mr. Pritchett well for ten years—had been often with him in his home, and saw him soon after he came out to his country home in the summer of 1911, and had also seen him when he was out there the previous summer. This witness says that Mr. Pritchett's appearance and demeanor had completely changed in the summer of 1911; that he could not carry on an intelligent conversation, could not complete a sentence, and in discussing a subject he would fly from that to another, and his actions in every way were those of a man who was demented. He says on one occasion Mr. Pritchett came to his house with his wife's sweater on wrong side out, and his shirt tail out of his trousers—was bareheaded, and was trying to borrow money to get to Nashville. He says he carried Mr. Pritchett to his house, where he remained until after dinner, eating dinner with him; that Mr. Pritchett afterwards bragged on the dinner to his

(Pritchett's) wife, and when she asked him what he had for dinner he said corn bread and buttermilk. He says that Mr. Pritchett would frequently try to borrow money from the neighbors to go to Nashville on, and would slip away from home and try to get to Nashville. He gave it as his opinion that Mr. Pritchett was of unsound mind in the summer of 1911, and incapable of understanding and conducting a business transaction.

Several other witnesses, who saw him at his country home in the summer of 1911, testified to similar conduct on an ordinary business transaction.

Dr. Voorhies, of Columbia, a physician of twenty-seven years' standing, and who had known Mr. Pritchett for a number of years, at the instance of Mr. Pritchett's wife, called on him at his country home in the summer of 1911, the latter part of June or the first of July, and spent the day with him. He testified fully as to Mr. Pritchett's mental condition at that time. He states that Mr. Pritchett was insane—"was a crazy man:" that he had practically no mind at all—didn't have mind enough to sit down to the table and eat his dinner like a man should; that he could not carry on an intelligent conversation; that he seemed to realize that he was demented and would say "Ain't it hell to be demented;" that he wanted to go to Nashville, saying he had business at Nashville, and wanted to go. Dr. Voorhies says that going to Nashville was Mr. Pritchett's principal theme during the day. He says that he advised Mrs. Pritchett to send him to Oxford Retreat, which the proof shows is a sanatorium where the insane are treated. He testified that, in his opinion, Mr. Pritchett was at that time wholly incapable of comprehending or attending to any business

transaction, and that his mental condition was such that he did not see how any man could talk with him a minute and a half without knowing that he was demented.

Mr. J. H. Dinning, a lawyer of Columbia, Tenn., saw Mr. Pritchett in his office on July 6, 1911, with his wife, which was about ten days after the consummation of the sale in question to defendant; that Mrs. Pritchett wanted him to prepare a deed for Mr. Pritchett to execute, conveying to her, as trustee, his property, in order to preserve it; that Mrs. Pritchett told him that Mr. Pritchett was threatening to convey all the property he had, and she wanted some sort of a conveyance made to her in order to prevent him from doing this. Mr. Dinning says that he talked with Mr. Pritchett and at once learned that he was incapable of executing any sort of a valid conveyance; that his entire lack of understanding of what was contemplated was fully apparent. He says he so told Mrs. Pritchett, but after talking with her and being convinced that it might subserve the purpose for which Mrs. Pritchett wanted it, and being convinced of the good faith of Mrs. Pritchett, and being assured by her that she only wanted the conveyance that it might be regis-tered, and notice in that way given to prospective purchasers that the title was no longer in him, and thinking it would probably preserve his property, he did draft a deed for Mr. Prichett to execute, conveying his property to his wife, as trustee, which deed was executed by Mr. Pritchett, and was afterwards duly recorded in the register's office of Davidson county.

Mrs. Pritchett and her daughter both testified to many other facts, not herein stated, which tend to show Mr.

Pritchett's mental incapacity to transact business from October 25, 1910, till his death in 1915; but we cannot undertake in this opinion to detail all the facts to which they testified. As to most of these facts they are corroborated by the testimony of witnesses in no way connected with Mr. Pritchett.

We think it is sufficient to say that Mr. Pritchett became demented in October, 1910, and that his condition gradually grew worse until his death in 1915. In 1912 he was placed in Oxford Retreat, a sanatorium for the insane, at Oxford, Ohio, for treatment, but his condition did not improve. He gradually grew worse until his death.

Mrs. Pritchett testified that when her husband was stricken in October, 1910, she endeavored to keep his mental condition from becoming known, because of the embarrassment and humiliation that she and the other members of the family would feel to have his friends and acquaintances know of his demented condition; but we think the weight of the evidence shows that his mental condition, in the summer of 1911, and at the time of the sale, was apparent to those who came in contact with him; and that the defendant's officers, who negotiated the purchase of the stock in question, knew, or could have known by the exercise of ordinary diligence, his mental condition, and either knew, or could have known, that he was mentally incapable of making a valid and binding contract.

Both Mr. Plater and Mr. Palmer, who dealt with him in this stock transaction, testified that they did not know of his mental incapacity at the time they purchased the

stock, and that if he were demented at that time his mental condition was not apparent or discernible. Their testimony is corroborated by that of other witnesses; but, as before stated, we think the weight of the evidence is with the complainant on this question.

It results, therefore, that as to the individual stock of Mr. Pritchett, purchased by the defendant, complainant is entitled to relief under her bill.

According to the great weight of authority, the contract of an insane person made prior to an adjudication of his insanity and the appointment of a guardian is voidable. Contracts made by an insane person after he has been regularly adjudged insane are generally held to be absolutely void, the inquisition of insanity being regarded as notice, actual or constructive, to all the world of the fact of insanity. 14 R. C. L. section 38.

The weight of authority also is to the effect that where a contract with an insane person has been entered into in good faith, without fraud or imposition, for a fair consideration, without notice of the infirmity, and before an adjudication of insanity, and has been executed in whole or in part, it will not be set aside unless the parties can be restored to their original position. Such contracts are enforced against the insane person, not so much because they possess the legal essential of consent as because by means of an apparent contract he has gained an advantage or benefit that cannot be restored, and that therefore it would be inequitable to permit him, or those in privity with him, to repudiate it.

But if a contract is made with an insane person by one having knowledge of his incapacity, such contract may

be set aside on the ground of fraud, and knowledge or information, such as would lead a prudent person to the belief that the other party to the contract is of unsound mind, is such evidence of bad faith as will avoid the contract. 14 R. C. L., section 40; 15 Am. Dec., 367, note; Ann. Cas., 1914D, 869; *Bank* v. *Sneed,* 97 Tenn. 120, 36 S. W., 716, 34 L. R. A. 274, 56 Am. St. Rep., 788.

In 22 Cyc., pp. 1203-1205, the rule is stated to be that the contract of an insane person may be avoided so long as it is wholly executory, notwithstanding the fact that the other party entered into the same in good faith and in ignorance of his infirmity; but where the contract has been executed so that the insane person has received a benefit from it, and the parties cannot be restored to their former position, proof of the actual insanity at the time of making the contract, unaccompanied by any proof that the other knew or ought to have known of his condition, will not avoid the contract. It is otherwise, however, if the sane party knew of the other's insanity, or if the circumstances were such that as a reasonable and prudent person he should have known of it.

It is insisted by the defendant that, if complainant is entitled to recover as to the individual stock of her ward, she is only entitled to recover the difference between the price paid by defendant for said stock and its highest market value during the year 1911, which the proof shows was $83.50 per share. This contention is based upon the fact that all of the indebtedness for which said stock had been pledged as collateral would have fallen due before the expiration of the year 1911, and that defendant would have had the right, under its collateral

144 Tenn.—28

agreement, to sell said stock, either publicly or privately, and without notice to Mr. Pritchett, to satisfy said indebtedness, regardless of his insanity.

This is, perhaps, true, but the stock was not sold under the collateral agreement. The complainant was entitled to recover the stock in specie, but having elected to recover its value, less the price paid by defendant for it, we think she was entitled to recover the market value of the stock at the time of the trial, which the proof shows was $105 per share. This would have the effect of restoring the *status quo* of the parties. If the measure of recovery contended for by the defendant should be adopted this would not result.

It is next insisted by defendant that the chancellor committed error in decreeing complainant a recovery as to the joint or partnership stock owned by Stockell and Pritchett. As to this stock it is insisted that Stockell and Pritchett were partners, and that the sale of said stock was negotiated to defendant by Mr. Stockell, who had the legal authority to make the sale; that Mr. Stockell made the sale in good faith, and, therefore, it was binding upon his partner, Mr. Pritchett.

Upon the other hand, it is insisted by complainant that this stock was not owned by Mr. Stockell and her ward as partners but as joint owners. In other words, complainant insists that the agreement entered into between Stockell and her ward to purchase this stock did not constitute a partnership relation but a joint adventure, and that Mr. Stockell was without legal authority to bind her ward in the sale of said stock.

Chancellor Kent in his Commentaries defines a partnership as "a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions." 3 Kent's Commentaries, 23. And it has been said that where persons associate themselves together to carry on a joint business for their common benefit, to which each contribute either property or service, and the profits arising therefrom are to be shared between them, it constitutes a partnership. *McMurtrie* v. *Guiler*, 183 Mass., 451, 67 N. E., 358. And likewise it has been declared that a partnership is a voluntary contract between two or more persons who place their money, effects, labor, and skill, or some or all of them, into lawful commerce or business, with the understanding that there shall be a community of profits between them. *Carter* v. *McClure*, 98 Tenn., 109, 38 S. W., 585, 36 L. R. A., 282, 60 Am. St. Rep., 842.

" 'A partnership,' says Judge STORY, 'is usually defined to be a voluntary contract between two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, with the understanding that there shall be a communion of the profits thereof between them.' " *Mallory* v. *Oil Works*, 86 Tenn., 598, 8 S. W., 396.

A partnership as between the parties is always created by a voluntary agreement of the parties and not by operation of law alone. 115 Am. St. Rep., 412, note.

There is a partnership wherever there is a community of interest in the profits of the business or transaction

by the parties as principals or proprietors. 115 Am. St. Rep., 418, 431. And the agreement to share the profits *prima facie* implies an agreement to share the losses. 115 Am. St. Rep., 433, 434, notes; 18 L. R. A. (N. S.), 997, note, 1002, note; *Gavin* v. *Walker*, 14 Lea, 645, 646; 115 Am. St. Rep., 406, note; 18 L. R. A. (N. S.), 973, 976, note; *Johnson Bros.* v. *Carter*, 120 Iowa, 355, 94 N. W., 850; *Ruggles* v. *Buckley*, 158 Fed., 950, 86 C. C. A. 154; *Huggins* v. *Huggins*, 117 Ga., 151, 43 S. E., 759.

It is unnecessary to the creation of a partnership that the business relation entered into, which constitutes it, be called by that name. *Fougner* v. *First Nat. Bank*, 141 Ill., 124, 30 N. E., 442; *Beecher* v. *Bush*, 45 Mich., 188, 7 N. W., 785, 40 Am. Rep., 465; *King* v. *Remington*, 36 Minn., 15, 29 N. W., 352; *Fairly* v. *Nash*, 70 Miss., 193, 12 South., 149.

In *McDonald* v. *Campbell*, 96 Minn., 87, 104 N. W., 760, it was held that all that is necessary to establish a partnership is that there be competent evidence that the parties entered into contractual relations by which they combine their property, labor and skill as principals for the purpose of joint profits.

In *Corey* v. *Cadwell*, 86 Mich., 576, 49 N. W., 611, it was held that a community of interest in profits and capital is sufficient to prove a partnership.

A written contract will be binding on the partnership firm, although signed with the individual names of the partners instead of with the firm name, when it is shown that it was given in a firm transaction and intended as a firm obligation. 30 Cyc., 485.

Either party has the right to dispose of partnership property for the benefit of the firm. *Whitman* v. *Insurance Co.,* 14 Lea, 335; Bates on Partnership, sections 401, 403; 20 R. C. L., section 121.

The partnership may exist for a single transaction, venture or undertaking. 30 Cyc., 370, 380; 115 Am. St. Rep., 408, note; 18 L. R. A. (N. S.), 1090, note.

A joint adventure is generally regarded as of a similar nature to that of a partnership and governed by the same rules applicable to partnerships. *Slater* v. *Clark,* 68 Ill. App., 433; *Doane* v. *Adams,* 15 La. Ann., 350; *Chester* v. *Dickerson,* 54 N. Y., 1, 13 Am. Rep., 550; *Marston* v. *Gould,* 69 N. Y., 220; *Ross* v. *Willett,* 76 Hun, 211, 27 N. Y. Supp., 785; 15 R. C. L., 500.

In 23 Cyc., 453, it is said:

"The subject of joint adventures is of comparatively modern origin. It was unknown at common law, being regarded as within the principles governing partnerships. While some courts hold that a joint adventure is not identical with a partnership, it is regarded as of a similar nature, and governed by the same rules of law."

Now, as to the relation which Mr. Stockell and Mr. Pritchett bore to each other under their contract of January 2, 1908, we think they were in law and in fact partners. The contract expressly provides that the venture is one to buy gas stock on a joint account, and that the parties shall share in the profits equally. This constitutes the community of interest necessary to make the venture a partnership.

It appears from the testimony of Henry Stockell, a son of A. W. Stockell, that he heard his father and Mr.

Pritchett speak of their venture to purchase gas stock often, and that they spoke of it and discussed it as a partnership venture. He says that Mr. Pritchett, in speaking of the relation to him in his father's office, where he frequently called to see his father, spoke of it as their partnership business.

Mr. Frank Marr had several transactions and conversations with Pritchett and Stockell with reference to buying gas stock for them, and he understood them to be partners.

Mr. Richard Plater, the defendant's president, testified that Mr. Stockell told him before the stock was purchased by defendant that he and Pritchett were partners, and that at the time he purchased the seven hundred and fifty-eight shares from Mr. Stockell he understood it was the partnership stock of Stockell and Pritchett.

We are of the opinion that Mr. Stockell had authority to make the sale of the partnership stock, and that the sale of this stock to defendant was valid and binding on Mr. Pritchett, notwithstanding his insanity. The evidence shows that Mr. Stockell acted in the best of faith in selling this stock. The proof shows that the firm had been endeavoring to sell it for more than a year before it was sold in order that it might discharge its indebtedness, which was large, and which had been a source of great worry to its members on account of the depressed market condition of the stock, and the fact that they were paying a rate of interest on said indebtedness twice as large as the dividends they were receiving from the stock. We think the evidence shows that Mr. Stockell,

in selling the stock, did what he thought was to the best interest of the firm.

It results, therefore, that we think the chancellor committed error in allowing complainant a recovery for the partnership stock, and his decree will be modified accordingly.

A decree will be entered, however, in favor of complainant for the value of her ward's individual stock sold to the defendant on the basis of $105 per share, with interest from the date said stock was sold, and for the dividends collected thereon by defendant, with interest, less any payments and expenditures made by defendant to or for Mr. Pritchett for said individual stock, with interest from dates paid.

Complainant, as guardian, is taxed with two-thirds of the costs, and defendant with one-third.

### ON PETITION FOR REHEARING.

This cause is before us upon the complainant's petition to rehear on four questions, viz.:

1. What was the effect of the defendant company's knowledge of Samuel Pritchett's insanity at the time the sale of the stock in question was made?

2. Were Pritchett and Stockell agents for each other and their firm during the existence of the partnership and Pritchett's insanity?

3. Did Stockell assume and undertake to act as partner in making the sale, and did the defendant company deal with him as partner in that transaction?

4. Did Stockell have the power, merely as partner, and without the consent of his co-partner to sell the whole of

the partnership property and thus terminate the partnership, independently of the question of insanity?

Upon the first proposition it is insisted by complainant that defendant's knowledge, either actual or constructive, of Pritchett's insanity, at the time of the purchase of the stock in question, was equivalent to a previous judgment of insanity and worked a dissolution of the partnership in so far as defendant is concerned.

This insistence is based on the authority of *Isler* v. *Baker*, 6 Humph., 815. In that case it was held that an inquisition of lunacy found as to one of the partners, *ipso facto,* dissolves the partnership. It is said by defendant that the only reason for such a holding is that, by the judgment of inquisition, third persons are affected with constructive notice of it, and such legal *status* being once established it continues until changed. It is insisted, therefore, that defendant having knowledge, either actual or constructive, of Pritchett's insanity, at the time it purchased the stock in question, it can stand on no higher ground than a person who has purchased partnership property of a firm after one of the partners has been declared insane by an inquisition of lunacy.

The question determined in the case of *Isler* v. *Baker, supra,* was decided without discussion, or citation of authority, and that case stands alone among the decisions of this country and in England on the question. It is the only case that can be found anywhere that holds a judgment of inquisition, *ipso facto,* dissolves the partnership.

In *Raymond* v. *Vaughn,* 128 Ill., 256, 21 N. E., 566, 4 L. R. A., 440, 15 Am. St. Rep., 112, it was held that the

insanity of a partner does not, *ipso facto,* work a dissolution  of the partnership, but may constitute sufficient grounds to justify a court of equity in decreeing its dis-. solution.

Chancellor Kent (3d Kent, Commentaries, 58) says:

"Insanity does not work a dissolution of partnership *ipso facto.* It depends upon circumstances under the sound discretion of the court of chancery. But, if the lunacy be confirmed and duly ascertained, it may now be laid down as a general rule, notwithstanding the decision of Lord Talbot to the contrary, that, as partners are respectively to contribute skill and industry as well as capital to the business of the concern, the inability of a partner by reason of lunacy is a sound and a just cause for the interference of the court of chancery to dissolve the partnership, and have the accounts taken and the property duly applied."

And the same author (2d Kent, Commentaries, 645) says:

"In cases of partnership it would at least require a decree in chancery to dissolve the partnership on the ground of lunacy."

Story, in his work on Partnership, section 295, says:

"The common law, . . . upon grounds of public policy or convenience, holds that insanity does not ordinarily, *per se,* amount to a positive dissolution of the partnership, but only to a good and sufficient cause for a court of equity to decree a dissolution."

In R. C. L., vol. 20, section 184, it is said that insanity does not of itself terminate a partnership, but may constitute sufficient grounds for its termination.

To the same effect is 30 Cyc., 654; 20 Am. & Eng. Ency. of Law (2d Ed.), 209; 69 Am. St. Rep., 428, note; Ann. Cas., 1913D, 1148, note.

In all of these cases it was held that the insanity of a partner does not, *per se*, work a dissolution of the partnership, but may constitute sufficient grounds to justify a court of equity in decreeing its dissolution.

We think this is the better and more rational rule. At any rate, we do not feel justified in holding that mere knowledge, either actual or constructive, by one who deals with a partnership, of the insanity of one of the partners, effects a dissolution of the partnership in so far as he is concerned.

Upon the second proposition, i. e., whether Pritchett and Stockell were agents for each other and for their firm during the existence of the partnership, we do not think it can be seriously questioned that each partner is, in law, to be treated as the agent of the firm in all matters relating to the partnership, and within its scope, unless the articles of partnership limit such authority.

Upon the third proposition: Did Stockell assume and undertake to act as a partner in making the sale, and did defendant company deal with him as a partner of the firm? We think this question must be answered in the affirmative. It appears from the partnership agreement entered into between Pritchett and Stockell on January 22, 1908, that a sale of the stock to be purchased by them as partners should be made at some future time, because the partnership agreement provides that "such profit as is made on the purchased stock is to be equally divided between us." Further, the evidence shows that

Mr. Stockell had been endeavoring to negotiate a sale of this stock for more than a year before he sold the same to the defendant. The fact that a sale of the stock was contemplated by the partners also appears from a letter written to complainant by Stockell on July 5, 1911, which was only a few days after the stock in question was sold to the defendant. In this letter to complainant Mr. Stockell was explaining to her the partnership dealings between him and her husband. The letter reads:

"I consented to join him (Pritchett) and we did purchase several hundred shares, making notes to carry it, thinking that when our friends got in, as they had complained of the reduction in dividend by Williams, they would at once advance the dividend again to at least four per cent. when we could sell at a safe figure, and perhaps at an advance over what it had cost. Our side, though, went back on us, and declined to advance the dividend, and we were unable to sell and just had to carry it along by renewals. I then began an effort to get rid of the stock at a price to save us harmless, but was unable to do this until I urged Mr. Plater to sell it all in a block at eighty cents, he agreeing that he could get more for it in this way."

Mr. Plater testified that he understood that it was the partnership stock that he was buying from Stockell; in fact, it was known to all the parties that Stockell owned no stock in the Gas Company individually.

We think it is clear from the evidence that, in negotiating the sale to the defendant Plater & Co., Stockell was acting in his capacity as a partner and not as an individual, and it was so understood by the parties at the time.

Upon the fourth proposition, which is to the effect that Stockell did not have the power, merely as partner, and without the consent of his copartner, to sell the whole of the partnership stock independently of his copartner's insanity.

The general rule is that each partner may bind the firm by any act or contract that is embraced in the general scope of the partnership business. Each partner is considered generally as the agent of the firm in all matters pertaining to its business, and as such may bind the other partners the same as if he acted under a duly executed power of attorney for that purpose. *Schneider* v. *Sansom,* 62 Tex., 201, 50 Am. Rep., 521; *Blodgett* v. *Weed,* 119 Mass., 215; *Decker* v. *Howell,* 42 Cal., 636; *Campbell* v. *Dent,* 54 Mo., 325; *Pahlman* v. *Taylor,* 75 Ill., 629; *Kenney* v. *Altvater,* 77 Pa., 34.

It is also well settled that one partner has the authority and may sell the whole or any part of the assets of the firm in the regular course of business, or for the purpose of paying the debts of the firm, when there is no fraud in the sale. *Williams* v. *Roberts,* 6 Cold., 493; *Schneider* v. *Sansom, supra;* *Graser* v. *Stellwagen,* 25 N. Y., 315; *Williams* v. *Barnett,* 10 Kan., 455; *Halstead* v. *Shepard,* 23 Ala., 558; *Cayton* v. *Hardy,* 27 Mo., 536; *Arnold* v. *Brown,* 24 Pick. (Mass.), 89, 35 Am. Dec., 296; *Lamb* v. *Durant,* 12 Mass., 54, 7 Am. Dec., 31.

The evidence shows that Stockell sold the stock in question for the purpose of paying the partnership indebtedness, which amounted to more than $60,000, and in doing so he acted in the utmost good faith, and for what then appeared to be to the best interest of the firm.

It results, therefore, that complainant's petition to rehear will be denied.

Defendant has also filed a petition to rehear on the question of the measure of recovery to which complainant is entitled, growing out of the sale of the individual stock of her ward. It is insisted that the difference between the sale price ($80) and the highest market price at any time after complainant had notice of the sale to defendant Plater & Co., within a reasonable time—"say ninety days"—is the true measure of complainant's recovery.

In support of its contention defendant cites Williston on Contracts, Elliott on Contracts, and certain cases, none of which we think are controlling of the question here. They all relate to the measure of damages in cases where the contracting parties were sane and competent to act. Complainant's ward being insane and incapacitated to contract at the time he sold his individual stock, complainant, as guardian, was entitled to recover the stock in specie; but having elected to recover its value, less the price paid by defendant for it, she was entitled to recover on the basis of the market value of the stock at the time of the trial, which was the only way the *status quo* of the parties could be restored. It was accordingly ruled in the opinion of the court filed in this cause on a former day of the term.

The defendant's petition to rehear will therefore be denied.