W. T. CASH, Guardian v. JOHN F. RYAN, Sr., et al.

Eastern Section.   May 21, 1927.

No petition for Certiorari was filed.

1. **Contracts.** Contract with insane person entered into in good faith can not be avoided unless the party is placed in statute quo.

The weight of authority is to the effect that where a contract with an insane person has been entered into in good faith, without fraud, or imposition, for a fair consideration without notice of the infirmity, and before an adjudication of insanity, and has been executed in whole or in part, it will not be set aside unless the parties can be restored to their original position. Such contracts are enforced against the insane person, not so much because they possess the legal essential of consent as because by means of an apparent contract he has gained an advantage or benefit that cannot be restored, and that therefore it would be inequitable to permit him, or those in privity with him, to repudiate it.

2. **Contracts. Insane persons. Evidence. Evidence held to show contract was made with insane person in good faith and without knowledge of insanity.**

In an action to set aside a contract because the defendant was insane, where it was shown that at the time the defendant was engaged in business, that no unfair advantage was taken of him, and from the evidence it was plain that the party negotiating the contract did not know of defendant's insanity held that the contract was enforceable unless the parties could be placed in statu quo.

3. **Contracts. Insane persons. Evidence. Evidence held to show that contracting party could not be placed in statu quo and the contract was not voidable.**

In an action to recover on certain notes given for the purchase of a house and farm it was shown that the party was insane at the time the contract was made, but the fact was not known to the other contracting party, and the purchaser had torn away part of the house, but had made other improvements held that the place could not be returned in the same condition as it was received and the contract could not be avoided.

Appeal from Chancery Court, Carter County; Hon. S. E. Miller, Chancellor.

Reversed.

Robert Burrow, and J. D. Baumgardner, of Bristol, for appellant.

Miller, Seiler & Hunter, of Elizabethton, and Miller, Depew & Lee, of Johnson City, for appellee.

PORTRUM, J. Mrs Edna M. Minnick owned a tract of land in Carter county near the town of Elizabethton, which formerly was the home of Hon. Hamilton Smith, who served as the Chancellor of the first chancery division, and who erected a large brick building upon this tract of land and lived there for a long time.

The farm lay on Doe river and the brick mansion faced the river and the road which ran between the river and the house; the building contained twelve large rooms, the dimensions of the rooms being twenty feet by twenty feet, and eight of them are located in the main building and four in a wing, the latter four being used for kitchen and dining room on the lower floor and for bed rooms above. After Chancellor Smith's death his family continued to own and occupy the building for some years. In the year 1907 Judge W. R. Allen purchased the property and improved the building by replacing practically the whole of the old foundation, also making some other improvements; he moved into the premises in the year 1910 for the purpose of making the building his residence, but the roads from the place to Elizabethton where he practiced his profession soon became almost impassable and he became discouraged and removed to Elizabethton. In 1911 he sold the farm for $6,000, and at the time it contained 190 acres. Later, the exact time not being at hand, Mrs. Minnick purchased the farm, paying $11,500 for it. She improved the farm by building a barn at the cost of $1200,

and putting a metal cover upon the house; she also built fences and improved the land generally. She sold off a portion of this land for the sum of $4500, leaving her sixty acres upon which was located the buildings and bottom land.

Mrs. Minnick was a widow and the mother of several children, the majority of whom are minors, but she had two married daughters, if not more. One of the sons-in-law, Mr. W. Ray Hyder, was a rural carrier out of Elizabethton. Mrs. Minnick wanted to sell the farm and she asked $10,000 for it. Her son-in-law, Mr. Hyder, negotiated a sale of the land for her.

The purchaser was one John F. Ryan, who at that time was engaged in the coal business in Elizabethton, as a partner with another. He also was interested in a drug store, and it is said he dealt in real estate. After some negotiation he agreed to purchase the farm at the sum of $9,000. His offer was accepted and a deed was executed and he made a cash payment of $3,000, and represented the balance by promissory notes, two of $1,000 each and two of $2,000 each. The first two notes of $1,000 each were later paid, and the other two are due and unpaid. This suit is brought to collect these notes.

It is shown that soon after the trade Mrs. Minnick died, that is, she died on April 30, 1923, and the deed was executed March 24, 1923. Her son-in-law, W. Ray Hyder, qualified as the administrator of her estate and has administered it and received his discharge. Mr. W. T. Cash was appointed guardian for her minor children, who are named in the caption of the bill, and, presumably, under the terms of the administrator's settlement, these two notes of $2,000 each were turned over to the guardian as the distributive share of his wards in their mother's estate. One of the notes being past due and unpaid, he brings this suit as guardian, asking a sale of the property to satisfy the judgment. And pending this suit the other note matured and he files an amended and supplemental bill, asking judgment on the two notes and the foreclosure of the lien securing them.

Prior to the institution of the suit John F. Ryan was declared insane in an inquisition of lunacy and committed to the Eastern Insane Asylum at Bearden, Tennessee. George W. Ryan is his guardian, having succeeded one Collier, who was first appointed and resigned.

The guardian filed an answer to the original bill and amended bill, admitting the transaction and the execution of the notes, but alleging that at the time of the transaction his ward John F. Ryan, Sr., was a person of unsound mind and that Mrs. Minnick and her agent, the son-in-law, well knew the fact, or should have known it by the exercise of ordinary care, and because of the insanity of his

5 T. A.—37.

ward and the knowledge of the opposing parties his ward's estate was not liable for the outstanding notes, and he was entitled to recover for his ward the payments theretofore made. He then assumed the character of cross-complainant and sued to recover the $5,000 paid, and a cancellation of the notes outstanding, and prayed for the sale of the farm in satisfaction of the judgment, in the event it was not paid in a specified time. The cross-bill was answered, denying the material allegation.

The case went to trial upon the pleadings and proof, when the Chancellor held that John F. Ryan was in fact insane when the transaction took place, but that Mrs. Minnick, nor her son-in-law, knew of the insanity, and therefore the sale was voidable. The issue then presented is, was the guardian in a position to place the sellers in statu quo as a condition precedent to the avoidance of the contract?

Upon this issue it was shown that Ryan, while he was in possession of the property, and before he had been committed to the asylum, had torn down the brick wing of the building and destroyed four large rooms. He had also left the end of the building where the wing was torn away exposed and had calcimined the place. He had turned the face of the house around so that the front would face in an opposite direction and towards the new pike road, making the back face on Doe river. He built two porches to the old house and constructed concrete walks, painted the house and put in a delco system. Now it is insisted that while the guardian cannot return the house in its original condition, that he can return the property in as valuable condition as formerly. The guardian of the minors, Mr. Cash, insists that Ryan has no right to change the character of the property and return it without reference to the value of the improvements being as great as the damage done. He insists that he does not want concrete walks and the delco system.

The law applicable to the case is well settled and is not in dispute. In the recent case of Pritchett v. Plater & Company, 144 Tenn., 432, 232 S. W. 961 the court said:

"The weight of authority also is to the effect that where a contract with an insane person has been entered into in good faith, without fraud or imposition, for a fair consideration, without notice of the infirmity, and before an adjudication of insanity, and has been executed in whole or in part, it will not be set aside unless the parties can be restored to their original position. Such contracts are enforced against the insane person, not so much because they possess the legal essential of consent as because by means of an apparent contract has gained an advantage or benefit that cannot be re-

stored, and that therefore it would be inequitable to permit him, or those in privity with him, to repudiate it."

And in the older case of Bank v. Sneed, 97 Tenn., 121, 36 S. W. 716 the court said:

"It is conceded that, as a general rule, the contract of a lunatic may be avoided. To this, however, there is this well recognize exception, that where a contract has been entered into in good faith, without fraud or imposition, for a fair consideration, without notice of the infirmity, and has been so far executed, that the parties cannot be restored to their original positions, it will not be set aside by the courts."

It is clear from the two above quoted concise statements of the law that the court will exercise its equitable jurisdiction in order to protect an innocent party against injury, notwithstanding that the opposite party may have been an insane party, so long as this fact was not known, or could not by due care have been known. Using this rule as our guide, we shall determine, if under all the facts, the minor complainants can be restored to the original position, or placed in statu quo. There is no question but what Mr. Ryan was insane at the time of the transaction, in fact, he had been insane for years. His physicians had so informed his immediate family, but the Chancellor did not find as a fact that either Mrs. Minnick or her son-in-law, Mr. Hyder, knew that Mr. Ryan was insane, or that such facts existed as charged them with such notice. At the time of the sale Mr. Ryan was engaged in the coal business, with a partner, who evidently was not aware of Mr. Ryan's insanity; at least he continued to do business under the partnership. Ryan, at the time, owned, or had an interest in, a drug store. He was active about town, and from the facts we conclude that neither of the parties, nor the public, realized the extent of his incapacity. A great deal is said about an imposition upon him in reference to the sand in the river on the place; he undoubtedly entertained a delusion in reference to the sand, and thought it very valuable, but it seems that others were interested in the deposits of sand in the river and entertained opinions of an aggregated value of the sand as an investment. But some of them, upon investigation, knew more of the conditions than Ryan. The Chancellor did not hold that any one had imposed on Ryan in reference to the sand and from the proof we conclude that no false representations, or representations in bad faith, were made. And since there is no fraud the contract is not void, but voidable, as held by the Chancellor, and the sole question remaining is, can the parties be placed in statu quo?

Looking first to the value of the changes, and the question of whether the improvements made by Ryan are of equal value to the damage done by the destruction of the ell; the court said:

"The testimony on this question shows that Ryan, after he went into possession of the property, aside from tearing away the ell, built one or two porches, ceiled the house, did some concrete work, and built a road out to the main highway; and a number of witnesses testify that the property was worth as much following these things as before; while the testimony of complainant is directed alone to the question of the cost of restoring the ell, showing that it would cost $2500 or $3,000, or even more, to build it. The testimony is not as clear and satisfactory as it might be on this question, but the court is of the opinion that the weight of the evidence is to the effect that the property may be restored to complainant just as valuable as it was before, as regards the tearing away of the ell, on the one hand, and the changes made by the defendant Ryan, on the other hand."

The evidence referred to is indeed "not as clear and satisfactory as it might be," in fact, the testimony is very unsatisfactory. It is shown by Ryan's witnesses that it was a foolish, in fact, a crazy act on behalf of Ryan in tearing away the ell. They say it is the act of a crazy man. But, even so, if the other party did not know at the time of the sale of Ryan's insanity, then that party is not responsible for the act of Ryan, notwithstanding it may be an insane act. In the estimates placed by the witnesses, the delco plant was considered, and the concrete sidewalks, in fixing the value. Ordinarily one would not be required to take back property materially changed because perchance a delco system of equal value had been placed in the house; nor could you tear away one's house and replace it with sidewalks. As an element of damages as fixed by the witnesses, it was claimed that the house was too large for a small farm, and therefore Ryan was justified in tearing it away; but it is shown that the ell was used as a kitchen and dining room, and the rooms in the main house were large, so to remove the kitchen and dining room to the main house may greatly interfere with the useability of the house.

Weighing the evidence, after giving the whole careful consideration, we conclude that it is not shown the value of the improvements approximately equal the damage done by the removal of the ell. We are further of the opinion that the character of the change is so materially different, both in value and in kind, that the parties cannot equitably be placed in statu quo.

Another controlling fact in this law suit which illustrates that the parties cannot be placed in statu quo, and that, in fact, it would be inequitable for a court of equity to avoid this sale, is as follows:.

John F. Ryan has died pending this suit, and the cause has been revived in the name of his heirs at law. His relatives knew of his condition over a term of years, and some months after the purchase of the Minnick land he purchased another farm, then his relatives called upon the vendor and notified him of the condition of Ryan. But in

the instant case, while the kinspeople knew of the insanity of Ryan, and also must have known that Mrs. Minnick did not know his condition, and was contemplating selling the farm, and with this knowledge they gave her no warning, and permitted her to place herself in the position now detailed.

As said before, this cross-bill is prosecuted against the guardian of the five minor children of Mrs. Minnick, and a judgment in this case has been given against the guardian, and also the five minors, for the sum of $5,000. It is further shown that at least two daughters of Mrs. Minnick have received their distributive shares, and it is shown the debts of the estate have been paid, and that the assets, among other things, consisted of $4500; and it appears that the guardian of the minor children has taken over the two $2,000 notes due from Ryan, as their property. Now, the result is, a judgment has gone down for $5,000 against them; their two notes have been ordered cancelled, and they find themselves in the position of not only losing all of their distributive shares, but of owing $1,000 because of the fact that the trade in this case has been avoided. It is shown that Mrs. Minnick had an administrator, and that the two adult daughters had received their distributive shares apart of which was the two $1,000 notes paid by Ryan on the purchase price. The administrator, nor the adult children, are parties to this suit. The result, as detailed, is shocking, and we believe sufficient to deny the relief asked. It is true that if equity demanded it, we might remand the case in order to bring in the necessary parties, or to take proof to show the pro rata due from the minors, but, as stated, we do not think this is an equitable course.

It follows that the decree of the Chancellor will be reversed and a judgment given upon the original bill and the amended bill for the amount of the notes, interest, etc., and the case remanded to the lower court for the sale of the property in satisfaction of the judgment. The cost of this appeal is taxed against the appellee.

Snodgrass and Thompson, JJ., concur.