JAMES H. BREWER, Guardian et al. v. GLADYS GRIGGS, alias GLADYS BREWER.

Middle Section.  May 18, 1929.

Petition for Certiorari denied by Supreme Court, December 21, 1929.

Haggard & Haggard and Frank Boyd, all of Waynesboro, for appellant.

J. B. Garner and Pride Tomlinson, of Columbia, for appellee.

FAW, P. J.  This suit was begun by an original bill filed in the chancery court of Wayne county on September 28, 1925, by James H. Brewer, a resident citizen of Wayne county, Tennessee, who sued "as guardian for John Walker Brewer" . . . "a citizen of said County of Wayne, but now in the State of Indiana."

The said John Walker Brewer also appeared as a complainant on the face of the bill, but, after the bill was filed, he, through counsel, filed a petition in the cause, verified by his own signature and corporal oath, in which petition he alleged that the original bill was filed without his knowledge or consent, and he denied that said James H. Brewer had any right or authority to join him (John Walker Brewer) as a co-complainant in the bill. The said John Walker Brewer also prayed in his petition that he be permitted to intervene as a defendant in the cause, and that his petition be filed and treated as his answer to the bill of James H. Brewer. The prayer of the petition was granted by .the chancery

court and said petition was filed as the answer of John Walker Brewer to the bill.

The sole defendant named in the bill is described in the caption thereof as "Gladys Griggs, who now calls herself Gladys Brewer, a resident of said County of Wayne."

The purpose of the bill was, and is, to procure a decree of the court declaring void, or annulling, a marriage between said John Walker Brewer and the defendant, Gladys, which was solemnized on September 24, 1925. Such decree was sought on allegations that said John Walker Brewer was, at the time of said marriage ceremony, "demented," and mentally incapable of entering into a marriage contract, and that "said marriage was fraudulently procured and consummated" by the defendant and her mother. It is further alleged in the bill that, on August 22, 1922, complainant James H. Brewer was appointed the regular guardian of the said John Walker Brewer by the county court of the County of Wayne, since which time complainant's said ward had been continuously in a demented condition.

The prayer of the bill (after the usual prayer for process and waiver of answer under oath) is that, upon the hearing, said marriage between the said John Walker Brewer and the said Gladys Griggs be declared void, ab initio, by reason of the fraud in its procurement; but if complainant should be mistaken in the relief thus prayed for, then that said marriage be set aside and annulled by reason of the mental incapacity of said ward to enter into such contract; that, on final hearing, defendant be enjoined from in any way interfering with said John Walker Brewer or his property or effects in any manner whatever. There is also a prayer for general relief.

The defendant, Gladys, answered the bill and admitted her marriage to John Walker Brewer on the date named, but she denied that she or her mother had been guilty of any fraudulent or improper conduct in the premises, and she denied that the said John Walker Brewer was "demented," or non compos mentis, or mentally incapable of entering into a valid marriage.

John Walker Brewer, in his petition (which was treated as his answer to the bill), made the same denials as those made by the defendant Gladys as just stated, and, in addition, he denied that complainant James H. Brewer was, when the bill in this case was filed, or had ever been, his lawful guardian. It is averred in said answer of John Walker Brewer (in response to complainant's allegation that he was appointed by the county court of Wayne county, Tennessee, as the guardian of said John Walker Brewer), that no proceedings whatever were ever had in said county court to establish the insanity of said John Walker Brewer;

that no service of any process was ever had upon said John Walker Brewer; that none of the requirements leading to the establishment of insanity upon the part of said John Walker Brewer were taken in said county court; that all that ever happened was an entry of an order on the minutes appointing the said James H. Brewer as guardian of John Walker Brewer and reciting that it was because John Walker Brewer was insane, and, it is alleged by John Walker Brewer that said order is an absolute nullity.

A large volume of proof was taken on behalf of the parties, respectively, and the cause was heard by the Chancellor, who, after holding the case under advisement for a time, rendered an opinion which is brought up in the record and is as follows:

### "COURT'S OPINION AND FINDING OF FACTS.

"Gentlemen, it is understood that we have met for the purpose of disposing of the case of Brewer v. Griggs. I am glad the time has come because the case has given me a very great deal of trouble—about as much as any case I have heard.

"I feel that I should in the outset thank counsel in the case for the assistance they have rendered, not only in the preparation of the case for trial and in the trial, but for the fine briefs and everything they have done to help the court in arriving at the right thing. I felt from the beginning that this suit means so much to some of these parties—that their interests are so stupendous—that no mistake must be made.

"Quite a number of legal questions have been presented which have been difficult to determine, some of which I had not considered well at the time of the trial because I had not had sufficient time; and these never had proper consideration until after the briefs were handed in.

"One of these questions was as to the effect of the opinion and order of the Court of Appeals after a remand of the case. Of course, whatever that court actually decided became the law of this case. I find, however, after going into the matter, that the only thing before that court, and the only thing, therefore, actually decided by it was whether this court erred in allowing petitioner, John Brewer, expense money out of the funds in the hands of his guardian with which to develop his case, and ordering same paid over to the Clerk and Master of this court to be paid out on order of John Brewer's counsel. The decree in that court on this question is the only thing in that decision which can affect this case now.

"Another one of these questions was as to the validity of a decree in the county court of Wayne county declaring John W. Brewer a person of unsound mind. It was my opinion at the time of the trial that the county court, in lunacy mat-

ters, is a court of general jurisdiction, and this appeared to be the opinion of the Court of Appeals, but after a more careful consideration of the question, I find that this is not true, but that it is a court of special—purely statutory—jurisdiction in lunacy matters not proceeding at all according to the course of the common law. This being true, sufficient must affirmatively appear on the face of the record to show the case to be within the reach or jurisdiction of the county court of Wayne county, when it undertook to adjudge John Walker Brewer a person of unsound mind, and undertook to appoint for him a guardian, otherwise the lunacy decree and appointment of the guardian can be collaterally attacked.

"The necessary jurisdictional facts in such a case, required by the statutes, are the filing of a petition, service of process upon the person sought to be adjudged insane, and service of copy of petition on said person; the appointment of a guardian ad litem for such person; the testimony or affidavits of two reputable physicians, who are residents of this State.

"Upon the trial of this cause, the complainant offered as evidence the said decree of the county court of Wayne county purporting to adjudge John Walker Brewer a person of unsound mind and to appoint complainant his guardian. That decree was not introduced into this case until after the Court of Appeals had rendered its previous decree with reference to the allowance of expenses to counsel for John Walker Brewer pending the litigation. That decree of the county court of Wayne county does not show on its face these necessary jurisdictional facts, nor does the record anywhere show said necessary jurisdictional facts. In fact, the complainant admits that these statutory requirements were not complied with. These being the facts, I find that the said lunacy decree of the county court of Wayne county can be collaterally attacked, and it being collaterally attacked in this cause by defendants, I find this decree absolutely void from the beginning.

"It is further my opinion that, even if it should be held that the county court is a court of general jurisdiction in lunacy matters and this decree could not be attacked collaterally, I should be compelled to hold that it is void upon its face whether the court proceeded under the Acts of 1797 or 1919. Even if we say the decree adjudged John W. Brewer insane (which is not certain), it shows that there was no jury and that the court appointed the guardian instead of the county court clerk whose duty it was to appoint and the only one under the statute who had the power to appoint under the act.

"But the decree can be attacked collaterally. Then what appears? Hardly a thing was done in that proceeding that the law requires. No notice to John Brewer himself, no guardian ad litem appointed for him, no affidavits from local medical men as to the condition of his mind, no jury which our constitution guarantees to him, and then the court who had no power in any circumstances in the case, appointed a guardian for him based upon nothing except that guardian's statement and affidavit from some physician in the State of Georgia.

"Then it results that John Brewer has never been legally declared insane and has never had a guardian in so far as this record discloses—I mean a legal guardian, and, therefore, that the complainant, James Brewer, has no right to bring this suit.

"At the beginning of the case, it was a real question as to whether John W. Brewer could be permitted to come into court by petition to make himself a party defendant. In any aspect of the case—such a case as this—I never could see how, under any rule of law, he could be denied this right. But since disposing of the two questions above, there can no longer be a question about this matter.

"At the opening of the trial, there arose questions as to where lies the burden of proof in the case and as to certain legal presumptions. The court being then of the opinion that the county court decree adjudging J. W. Brewer insane (being influenced largely by the opinion of the Court of Appeals which had not been quite understood) ruled that the burden was upon the complainant to show that defendant, J. W. Brewer was insane at the time of the marriage, but that the decree of the county court was prima-facie evidence of his insanity and shifted the burden to defendants to go forward and show at least a lucid interval at the time of the marriage and so overcome complainant's prima-facie case, but taken all in all, the burden was on complainant to show the insanity at the time of the marriage. The court did not at the time consider or rule on the question of the presumption of law in favor of the consummation of a contract like this. The court also held at the time, and still holds, that if the defendant, John Brewer, was shown either by said decree or otherwise to have been insane at any time prior to the date of his marriage, the presumption of law is that he was still insane at the time of the marriage, etc. The disposition, however, of other legal questions above, disposed in large measure of the question as to burden of proof and legal presumption; and I might add

that in view of the proof in this case, regardless of where the burden of proof lies, I am driven to the conclusion that J. W. Brewer was sane at the time he married Miss Griggs. Even if the burden should be held to be on him, I find—and must say without difficulty, that he has carried it. But, of course, the burden was not upon him in any aspect of the case. I believe this was a natural marriage, that the young man loved the girl and the girl loved him, that there was ample sanity to make the contract on his part, and that they love each other yet and that each feels undone at this unwarranted interference of this man's brother, the complainant.

"I find the facts to be, that John W. Brewer was a rather peculiar sort of fellow all of his life, sometimes rather gloomy and usually very taciturn. He liked to be alone more than most young men and boys—all his life. He was submissive, too much so for his own good, perhaps; that after his return from the World War, and was pronounced a subject of pulmonary tuberculosis, these qualities became more pronounced at times and doubtless there were some mental disturbances. He was badly depressed at times, more so than a more courageous man would have been under the circumstances, but I believe that when he returned from the hospital in 1923 to his home in Wayne county he recuperated rapidly and was as nearly normal mentally as he was when he went into the army, or, as for that matter, at any other time in his life. While he was at home this time and after his health improved to a great extent, he paid his respects to a bright girl in the community for a number of months by the name of Norton. This ripened into a sort of courtship and was natural in all respects. With the many times she was with him and with all her interest in the matter and her opportunities for observing, this girl never detected anything wrong with his mind—this girl of the keenest kind of perception.

"His guardian fearing that the two would marry, took the young man back to the Indiana hospital where his health began at once to decline and so continued till the guardian thought there was no longer danger of his marrying the Norton girl and then brought him back home, after which his health rapidly improved and after a few months he began to pay his respects to the defendant, Miss Griggs, now his wife. This also ripened into a courtship which, after some six months, culminated in matrimony—a marriage grown out of love and respect for each other—a marriage as normal and sane as thousands and thousands of others that have taken place and are taking place all over this country. This unsophisticated

country girl was never able to detect anything wrong—any defect—about this young man's mind.

"When I first heard the depositions of the medical experts of the Indiana hospital, I was greatly impressed, but since I have read and studied them carefully they have lost much of their value. They will not bear scrutiny and analysis so well as they looked at first. I can see how they could have given these opinions with entire honesty and I have no doubt they did, but they clearly did not do it with the greatest of care. There was no fact, no mental phenomena, about John Brewer upon which they based their opinions which any one of these experts actually knew himself. This is especially true as to illusions and hallucinations. So that they had to depend upon what others told them and most largely upon what the complainant, Jas. H. Brewer, told them, and these representations from him, I must believe from the proof as a whole, were at least greatly exaggerated, and perhaps were more exaggerated than he himself was quite aware. His interest, intense interest, I think, blinded him.

"Whatever notion one may have as to this young man's mental condition long prior to his marriage, or long since that time, from the evidence in the case, I cannot escape the conviction that shortly before the marriage, at the time of the marriage and shortly after it, this young fellow had sufficient reason, sufficient mental capacity to make this contract—an agreement no one on earth could make for him, and one which I believe means all there is in life to these two young people, the defendants.

"Witness after witness possessing good common sense, though many of them in a way ignorant, many of them having known this young man for years, some of them all his life, witnesses wholly disinterested, come in here and say that they have had all sorts of opportunities to observe him, have dealt with him, run with him, and yet say they never detected a thing wrong with this young man's mind in their lives.

"I may be wrong, but I would not give the opinion of a witness such as some of these grown in the hills with their keen powers of perception—intuition, if you please, for that of some expert who had not had their opportunities for observation. they know—these country folk and they know they know even if they are unable to tell you how. They have come in here whole-heartedly and told us this boy's mind was all right.

"Take testimony of the young man who drove the couple to Giles county to be married, and the testimony of the sheriff

of this county as to this boy's actions and conversations on the second night after the wedding, they were conversations and actions of a good man, perhaps a man too meek, but they were not the conversations of an insane man, a man who did not know what he was about, although we see him here under the most trying circumstances. He had just been snatched from his new wife and was being ruthlessly carried away to another State perhaps to remain till death. He was sane.

"The attitude of the guardian of John Brewer was not what one would expect of a guardian toward an insane ward. Regardless of what he says, this guardian let this ward go about at will and he was not afraid to let him go—not afraid that this ward could not take care of himself even in a strange city with a roll of money on his person. He went about in Wayne county and did his own trading and from the mouths of all the eyewitnesses, did it well and intelligently. What does it mean that this guardian permitted this boy to go out alone at night in the City of Nashville, a strange city and a country boy? It means that this guardian thought his ward had sufficient capacity to take care of himself with money in hand in a big, strange city at night.

"This young fellow thought he had a fatal malady, had always strong religious instincts, never highly courageous, was moody, often brooded, was sometimes quite melancholy, sometimes acted in a way that might lead some to think him partially insane, but this was not insanity. His health seems never to have been robust, but when he would return to his home, his old haunts, his health would improve so that when he was waiting upon the Norton girl and later upon Miss Griggs he had recovered his spirit and was as normal as he had ever been, as normal as the average young man.

"Every lawsuit has its own atmosphere. This one is no exception. It has an atmosphere so dense and piercing that one cannot help but feel it. I cannot help but feel that this couple has been wronged. I could not escape the conviction if I would. I do not mean to say that complainant wilfully started in to wrong the defendants. But he is interested, very much interested. It crops out everywhere in this record. He may have meant no harm, but, nevertheless, he has committed a wrong to them. His treatment has not been right. His interest has blinded him so that he could not see things in their proper perspective. He saw a brother afflicted with a fatal disease and possessed of a goodly sum of money. This brother would perhaps soon be dead, and he foresaw this about to be diverted from his relatives to a stranger, as he viewed the

Griggs girl, although she was the nearest and dearest thing on earth to this brother and the money was all his. This is human, but it is not right.

"I believe, if John Walker Brewer were turned out, he could come back here to Wayne county and take his wife and they together could get along and be happy as the general run of young people. The money is his, he loves his wife, she loves him, and he is not insane. He is entitled to his wife, to his property, to his liberty, to his happiness. These considerations are so stupendous that it makes one shudder to think of withholding them from him longer.

"The bill must be dismissed, first because the complainant, Jas. H. Brewer, was not the guardian of J. W. Brewer and had no right to bring the suit; second, because it is not sustained by the proof.

"Let a decree be entered accordingly.

"J. C. Hobbs,
"Chancellor."

Pursuant to the foregoing opinion of the learned Chancellor, a decree was entered as follows:

"This cause came on this day for further and final hearing before the Honorable J. C. Hobbs, Chancellor, upon the whole record, including the pleadings, depositions on file and the oral testimony of witnesses examined in open court, and the exhibits thereto; from all of which the court is of the opinion, and so orders, adjudges and decrees that the equities in complainant's bill have been fully denied in the answer and met and overcome by the proof, complainant's bill is accordingly dismissed.

"The court is of the opinion that the defendant John Walker Brewer was sane at the time of his marriage with his co-defendant, Gladys Griggs Brewer, and that said marriage was valid and binding in every respect, and wholly without fraud; that the decree of the county court of Wayne county, Tennessee, entered on the minutes of said county court on the —— day of ———————— 19——, and introduced as proof in this cause, adjudging and declaring John Walker Brewer of unsound mind, and appointing complainant, James Henry Brewer, his guardian is void, and that the same was illegally obtained, can be collaterally attacked—all of which is ordered, adjudged and decreed by the court.

"It is further ordered, adjudged and decreed by the court that James H. Brewer, individually, pay all the costs of this cause, for which let execution issue.

"To which decree and orders of the court the complainant excepted and prayed an appeal to the Court of Appeals sitting at Nashville, Tenn., which is granted upon the execution and filing of an appeal bond in the penalty of $250 conditioned as provided by law by the complainant, and for satisfactory reasons appearing to the court the complainant is allowed thirty days from this date in which to file such bond.

"And upon motion of the complainant and for sufficient reason appearing to the court the complainant is allowed thirty days in which to prepare and file a bill of exception embracing the oral proof, exhibits etc., in the cause, and also upon motion of complainant it is ordered by the court that original photograph of John Walker Brewer and the trunk and its contents all be sent up with the transcript.

"Defendant excepts to filing the photograph, and its being made a part of the record because same was not filed during the progress of the trial, and no opportunity to cross-examine was had as to same, and same was never identified.

"Overruled."

The appellant has filed and presented fourteen assignments of error; but the crux of this case is the question of the validity or invalidity of the decree or judgment of the county court of Wayne county entered on August 22, 1922, purporting to appoint James H. Brewer as guardian of John Walker Brewer.

It is seen that the Chancellor was of the opinion that said decree of the county court was "absolutely void from the beginning," and, in his final decree, he adjudged that said decree was "illegally obtained" and "void." The findings and decree just mentioned are challenged by a number of appellant's assignments of error, and a decision of the question thus presented is material to the proper disposition of all of appellant's assignments of error.

If said county court decree of August 22, 1922 (to which we will hereinafter refer as the county court decree), was void, James H. Brewer is not, and never has been, the lawful guardian of John Walker Brewer, and James H. Brewer was, when the bill in this case was filed, has been ever since, and is now, wholly without right to maintain a suit to obtain annulment of the marriage between John Walker Brewer and defendant Gladys, for the courts are without jurisdiction to decree an annulment of a marriage upon a bill brought by "a stranger to the contract." McKinney v. Clarke, 2 Swan, 320, 38 Corpus Juris, p. 1353; Schouler's Marriage, Divorce, Separation & Domestic Relations (6 Ed.), Vol. 2, section 1147.

In McKinney v. Clark, supra, the court said:

"The contract of marriage, then, having its foundation in nature, and resting, in its origin, upon the mere consent and mutual agreement of the parties, when complete according to civil regulations, becomes indissoluble, except by death or divorce; and so long as the relation is acquiesced in by the immediate parties, no tribunal on earth is clothed with the jurisdiction to interpose to annul it. No more startling or absurd proposition can be conceived, than that a marriage, legal in form, acquiesced in and held obligatory by the parties, and recognized as valid in law, might be annulled at the instance of a third person, for any cause whatever. So far as regards the legal consequences resulting from marriage, either as respects the parties or third persons, it can be of no consequence what were the motives or inducements to the contract. The only enquiry, at least as to third persons, is, does a marriage in fact exist according to the prescribed forms of law? If so, the motive which prompted the marriage, or the consequences flowing from it, are wholly irrelevant, so far as relates to the validity or effect of such marriage.

"If a marriage may be annulled for fraud, it must be such a fraud as operates upon one or other of the immediate parties to the contract, and has the legal effect of vitiating the contract between the parties, ab initio. But, as respects strangers, fraud cannot be predicated of a contract which the immediate parties thereto may lawfully enter into, which no principle of municipal law forbids, or can restrain the consummation of. From these obvious principles it results that to entertain the present bill would be an usurpation of jurisdiction conferred upon no human tribunal, and which, consistently with the fundamental principles of society, never can be."

In Schouler on Marriage, etc., supra, it is said that "marriage stands or falls by public permission with reference only to the marriage parties; and wherever they have legally assumed the relation as one agreeable to themselves, outsiders cannot meddle with the status from outside considerations."

The fact that complainant is a brother of John Walker Brewer, and as such is one of his heirs-expectant, does not vest him with an interest which will enable him to maintain a suit to annul the marriage involved in this case. Harmon v. Harmon, 141 Tenn., 64, 206 S. W., 333.

On the other hand, if the county court decree was a valid adjudication that John Walker Brewer was a person of unsound mind, and a valid appointment of James H. Brewer as his guardian, the complainant, as such guardian, could institute, prosecute and control a suit to annul the marriage of his said ward. Wil-

liams v. Gaither, 139 Tenn., 587, 202 S. W., 917; 38 C. J., p. 1353; Schouler's Marriage, etc. (6 Ed.), Vol. 2, section 1104.

If there was a valid judicial ascertainment by a competent court that John Walker Brewer was a person of unsound mind on August 22, 1922, the law would presume his continuance in that condition until his restoration to sanity was established by evidence. Haynes v. Swann, 6 Heisk., 560, 587.

However, such judgment would not be conclusive, but merely prima-facie evidence against persons not actually parties to the inquisition. McDowall v. Morrell, 5 Lea, 278, 285; Thomasson v. Kercheval, 10 Humph., 322, 325; Pritchett v. Plater & Co., 144 Tenn., 406, 423, 232 S. W., 961.

The jurisdiction of the county courts of this State over the persons and estates of idiots, lunatics, and other persons of unsound mind had its origin in the Act of 1797, chapter 41, and was exclusive until the Act of 1851-52, chapter 163, conferred concurrent jurisdiction of the subject on the chancery courts.

The procedure "in relation to persons of unsound mind," in the county court, is prescribed by sections 3681-3690, of the Code (Shannon, 5451-5460), and the procedure in the chancery court in such cases is prescribed by sections 3691-3719 of the Code (Shannon, 5461-5489).

As the appellant is relying solely upon the aforesaid decree of the county court for his authority to sue as guardian of John Walker Brewer, and as an adjudication that John Walker Brewer is a person of unsound mind, we will quote only the Code sections relating to the procedure in the county court, which sections are as follows:

3681. "Jurisdiction over the persons and estates of idiots, lunatics, and other persons of unsound mind, is intrusted to the county and chancery courts."

3682. "Upon information made to the county court, that any idiot or lunatic resides within the jurisdiction thereof, the court shall order the sheriff to summon a jury of twelve freeholders, to ascertain by inquisition the idiocy or lunacy, and the property and estate of the idiot or lunatic, and make return thereof to the court at that or the next succeeding term."

3683. "The following may be the form of the writ:
"STATE OF TENNESSEE)
"——— County.         )
"To the Sheriff of ——— county, greeting:

"You are hereby commanded to inquire, by the oath of twelve freeholders, summoned by yourself, whether ——————— of ——————— in the county of ——————— is an idiot or lunatic, or

is otherwise of unsound mind, so that he has not capacity sufficient .for the government of himself and his property; and if so, from what time, after what manner, and how; and if the said —————————, being in the same condition, hath alienated any lands or tenements or not; and if so, what lands and what tenements, to what person or persons, where, when, after what manner, and how; and what lands and tenements, goods and chattels yet remain to him; how much they are worth by the year; whether he has a wife and children and their names and ages. And you are further commanded, that, at certain days and places, appointed by yourself, you diligently make inquisition in the premises; and the same, distinctly and plainly made, return into the county court of said county at its next session, together with this writ. Witness ——————, clerk of said court, at office in —————, the —— day of —18.''

3684. ''The writ of inquisition may be returnable to the same term of the court from which it issues, if the court so direct; and, in such case, the same proceedings shall be had as if the return were made to the next succeeding term.''

3685. ''The Clerk of the county court, or any Justice of the Peace, may, on application of either party, issue subpoena for witnesses to attend the inquisition, and such witnesses are subject to the penalties and entitled to the privileges of other witnesses.''

3686. ''The person on whose application the inquisition issued, is liable for costs in case the defendant is not declared a lunatic; and if so declared, the costs shall be paid out of the lunatic's estate.''

3687. ''Upon the return of the jury that the person is an idiot or lunatic, and that he has property, the court shall appoint a guardian for the person and property of such idiot or lunatic, who shall give bond and account as other guardians.''

3688. ''If the idiot or lunatic has no property, or not sufficient for his maintenance, he may be let out for the term of one year to the lowest bidder, as other poor persons, or otherwise provided for as the court may direct.''

3689. ''If let out to the lowest bidder, bond and sufficient security, to be approved by the court, shall be taken for the safe-keeping, providing with sufficient diet, washing, and apparel, and proper treatment for the term of letting.''

3690. ''Any Justice of the Peace, in the recess of court, if satisfied from the finding of a jury, or otherwise, that there is apparent danger of violence being offered by such idiot or

lunatic to the person or property of others, may commit him to jail until the next term of the court."

The above-quoted sections of the Code contain no specific provision for notice to the defendant (the alleged non compos mentis), but it is provided by section 3695 of the Code (Shannon, 5465) that the defendant shall be served with a copy of the petition, and notice of the time and place of holding the inquest, at least five days previous thereto; and it is equally imperative that such personal notice be served on the alleged lunatic when the application is to the county court. Ex parte Dennis Dozier, 4 Baxt., 81; Davis v. Norvell, 86 Tenn., 36, 9 S. W., 123; Hunt v. Searcy (Mo.), 67 S. W., 206. And without such notice, the judgment or decree is void. Albright v. Rader, 13 Lea, 574, 577.

In the instant case, it appears from the undisputed testimony of the complainant himself that the county court decree in question was obtained simply upon his personal application to the County Judge of Wayne county, and upon the presentation to the County Judge of an ex parte affidavit of Dr. E. W. Allen, assistant physician of Allen's Invalid Home, at Milledgeville, Georgia, which certificate was as follows:

"ALLEN'S INVALID HOME.

"Dr. H. D. Allen, Supt.

"Assistant Physicians,

"Dr. E. W. Allen, Dr. Richard Binion.

"Milledgeville, Ga.

"August 9, 1922.

"To Whom it may Concern:

"This is to certify that John H. Brewer has been a patient at Allen's Invalid Home, Milledgeville, Ga., since Mar. 22, 1922.

"In addition to having pulmonary tuberculosis he is suffering form a psychosis, dementia precox. As his actions are dominated to a certain extent by delusions, and his judgment is poor, it is my opinion that he is incompetent to supervise his personal and financial affairs and should have a guardian appointed for his own protection.

"E. W. Allen,

"E. W. Allen, Asst. Physician,

"Allen's Invalid Home,

"Milledgeville, Ga.

"Personally appeared before me this 9th day of August, 1922, E. W. Allen, who swears that the above statement is true.

"Alonzo Simpson,

"N. P. Baldwin county, Ga."

There was no petition, no notice to John Walker Brewer, the alleged "person of unsound mind," no inquisition by a jury, and

no evidence before the County Judge except the aforesaid ex parte affidavit of a non-resident physician.

If the parol evidence touching the manner in which the decree of the county court was obtained can be considered, it seems clear that said decree was, and is, wholly void, and of no effect, either as an adjudication that John Walker Brewer was a person of unsound mind or as an appointment of a guardian for him. But the parol evidence as to these matters was admitted over the objection of the complainant, and it is urged upon us, on behalf of complainant, that the decree of the county court is not subject to collateral attack, and that the Chancellor erred in holding to the contrary.

The county court decree here in question reads as follows: .

"State of Tennessee, ⎱ Wayne County Court.
"Wayne county. ⎰

"It appearing to the court 'on application of Jas. H. Brewer to be appointed guardian of Jno. W. Brewer.

"That the said Jno. W. Brewer is a person of unsound mind, and the court being satisfied as to the rights of Jas. H. Brewer, to the guardianship of said ward, he is so appointed.

"Whereupon the said Jas. H. Brewer qualified and gave bond in penal sum of $2000, conditioned as required by law, with Carrie E. Brewer, J. F. Casteel and S. M. Brewer as sureties thereon, all of whom acknowledged the same in open court.

"It is therefore ordered that Jas. H. Brewer be clothed with all the powers and duties of guardian of said ward, and that letters of guardianship issue to him accordingly."

If the county courts of this State, in the exercise of their jurisdiction over the persons and estates of idiots, lunatics and other persons of unsound mind, are courts of general jurisdiction proceeding according to the course of the common law, the decree here in question is not subject to collateral attack; but, on the other hand, if in such cases the county courts are exercising a special, limited jurisdiction, resting altogether on statutory authority, said decree was, and is, open to collateral attack, and the Chancellor did not err in so adjudging. 15 R. C. L., pp. 880-882; Brown on Jurisdiction (2 Ed.), section 20a, pp. 103-104.

In Brown on Jurisdiction, supra, it is said:

"If a court be a court of general common-law jurisdiction the presumption arises that, because of its acquaintance with the forms of the law and the rules of practice governing it, it acted in accordance with such rules and did not act until every prerequisite prescribed by the law had been complied

with, unless the contrary appears from the face of the record. This presumption arises, first, because of the general powers and jurisdiction over many actions or classes of actions that exist, and the presumption attaches to it that it possessed jurisdiction over the subject-matter and acted under the rules of law after the parties had all been properly brought before it. The presumption further arises in favor of such court that its powers had been properly invoked by a suitable petition or complaint laid before it, setting forth the cause of action; that its process had been properly served on the defendant, and that the subject-matter was one it had authority to try.

"On the other hand, a court having limited jurisdiction is not indulged with such presumption of regularity, and the law requires that it appear from the record and proof that the subject-matter of the action had before the court was within its judicial powers; that due service of its process had been made upon the defendant within its jurisdiction, and a full record of its proceedings should be set forth. Where the proceedings before such court are in rem, it must appear that the court had jurisdiction over the subject-matter, that the property was brought before it and was under its control, and that the proper statutory notice or warning had been given to the owner, defendant, giving the court the right to act as it did act. In respect to these matters the jurisdictional facts must all appear from the face of the record or be shown aliunde to sustain the judgment. When these facts do appear, then every presumption exists in favor of such court, and its judgments are presumed to be correct."

We think the foregoing quotation from Brown on Jurisdiction states the law as it has been declared by our Supreme Court. Pope v. Harrison, 16 Lea, 82, 89; Puckett v. Wynns, 132 Tenn., 513, 523, 178 S. W. 1184; Wilkins v. McCorkle, 112 Tenn., 688, 707, 80 S. W., 834; Reinhardt v. Nealis, 101 Tenn., 169, 46 S. W., 446; Harris v. McClanahan, 11 Lea, 181, 185.

"The settled rule in this State is, that nothing shall be intended to be out of the jurisdiction of a superior court but that which specially appears to be so; and, on the contrary, nothing shall be intended to be within the jurisdiction of an inferior court of special and limited jurisdiction, except that which is expressly alleged." Harris v. Hadden, 7 Lea, 214, 216; Kilcrease's Heirs v. Blythe, 6 Humph., 378, 389; Hopper v. Fisher, 2 Head, 253, 257; Bass v. Southern Surety Co. et al. (Tenn.), 12 S. W. (2nd Series), 714.

We think that the rules applicable to judgments and decrees of courts exercising a limited or special jurisdiction are well stated in Corpus Juris, as follows:

"Nothing is presumed in favor of the judgment of a court of inferior or limited jurisdiction, as against a collateral attack; but the jurisdictional facts must affirmatively appear either on the face of the record, or, according to some cases, by evidence aliunde, except as to facts required to be spread upon the record." 34 C. J., p. 544.

"There being no presumption in favor of the jurisdiction of a court of inferior, limited, or special jurisdiction, it is usually considered necessary, in order to sustain the proceedings of such a court, that the record should affirmatively show that the court had jurisdiction, although the legislature which creates the court may change or qualify the rule or principle as to the record." 15 C. J., p. 842.

The records of a county court in this State must show the facts and proceedings necessary to give it jurisdiction, where it is undertaking to exercise a special statutory jurisdiction, not according to the course of the common law. Miller's Lessee v. Holt, 1 Overton, 49, 53; Kilcrease's Heirs v. Blythe, 6 Humph., 378, 389; Cooper v. Summers, 1 Sneed, 452, 456; Linnville v. Darby, 1 Baxt., 306, 310; Ex parte Dennis Dozier, 4 Baxt., 81; Norris v. Stephens, 9 Baxt., 433.

In Cooper v. Summers, supra, it was held that the jurisdiction conferred upon the county court by the Act of 1797, chapter 41, section 1, over the persons and estates of idiots and lunatics is "a special jurisdiction, created and regulated by the statute, and not a jurisdiction properly belonging to the court as a court of record proceeding according to the course of the common law."

The reason for the above-stated ruling in Cooper v. Summers, supra, is made apparent in Oakley v. Long, 10 Humph., 253, decided before the Act of 1851-1852, chapter 163, conferring upon the chancery court jurisdiction (concurrent with the county courts) over the persons and estates of idiots, lunatics, etc. In Oakley v. Long it was held that the inquisition of lunacy in the chancery court was void; and the court there stated the reasons for so holding as follows:

"Our Act of 1797, chapter 41, gives to the county court jurisdiction, to ascertain by inquisition, the idiocy or lunacy of any idiot or lunatic, who may reside in their county, and upon the return of such inquisition, to appoint guardians, etc. No legislative enactment confers upon the chancery court, either directly, or by implication, jurisdiction upon this subject. It does not, therefore, exist, unless it appertains to the chancery court, as a branch of its equity jurisdiction. But all the authorities are explicit, that this is not the case. In England, the Chancellor, it is true, exercises this jurisdiction, but it is a per-

sonal trust delegated to him under the sign manual of the king, and not as a court of equity. In Shelford on Lunacy, p. 15, it is said, 'when a person is found an idiot or lunatic, the king alone has the power to grant the custody of the idiot or lunatic, and his estate by sign manual, and, therefore, to save repeated applications to the crown, it has been the practice of the crown to entrust such power, by warrant, under the sign manual, countersigned by the two secretaries of State, to the Lord Chancellor, on his coming into office, by virtue of which warrant, and not as Chancellor, he has the ordering, and disposition of the persons, and estates of idiots and lunatics; and such warrant confers no jurisdiction, but only a power of administration.' Again, page 18, he says, 'neither the master of the rolls, nor the vice-chancellor can sit for the Lord Chancellor; or make any orders in matters of lunacy.'

"In Story's Equity Jurisdiction, section 1335, the distinction is taken between the jurisdiction of the court of chancery, in reference to infants, and to idiots and lunatics. He says: 'the jurisdiction over idiots and lunatics is distinguishable from that over infants, in several respects. The former is a personal trust in the Lord Chancellor, and especially delegated to him under the sign manual of the king; and from his appeal no appeal lies except to the king in council. On the other hand, the latter belongs to the court of chancery, and it may be exercised as well by the master of the rolls, as by the Lord Chancellor; and therefore an appeal does lie from the decision of the court of chancery, in cases of infants, to the house of lords.'

"It is manifest from the fact, that the jurisdiction as to infants may be exercised by the master of the rolls, and an appeal lies to the house of lords, that this jurisdiction belongs to the court of chancery, and equally so, that the jurisdiction as to idiots and lunatics does not belong to that court, for the reason that neither the Master of the rolls, nor the vice-chancellor can make any order in relation to them, and an appeal lies only to the king in council. Sheldon v. Fortescue Aland, 3 P. Will., 104, 107, Mr. Cox's note (A); Sherwood v. Senderson, 19 Ves., 285.

"All the authorities agree that, in the appointment of committees for idiots and lunatics, the Chancellor acts as the mere delegate of the crown; but they differ as to the source of his jurisdiction in the orders and decrees which are subsequently made, touching the person and property of idiots and lunatics. It may be inferred from Lord Redesdale's remarks, in Ex parte Fitzgerald, 2 Seb. and Lef., 435, that the superintendence of the conduct of the committee belongs to the court, as a court of

equity. And so Mr. Shelford (p. 17), upon authority of that case, states the law. But Judge Story (Eq. Jur., section 1364, note 2), conclusively refutes the doctrine, by showing from the authorities, that no appeal lies from these orders and decrees, except to the king in council; whereas, if the Chancellor acted in such cases as a court of equity, an appeal would lie from his orders and decrees, to the house of lords. Certainly no appeal lies from the chancery court, acting as a court of equity, to the king in council, but to the house of lords; and the fact, that an appeal from the orders and decrees, touching idiots and lunatics, lies only to the king in council, is conclusive evidence that these orders and decrees are made by the Chancellor, as the delegate of the crown, and not as Chancellor. It follows from what has been said, that the entire jurisdiction of the Chancellor, in England, upon the subject of idiots and lunatics, is derived from the warrant of the king, and that the chancery court, as a court of equity, has no jurisdiction of the subject.

"In the application of these principles, how can it be said, that the court of chancery, in this State, has jurisdiction of this subject? We have no king, whose duty, and prerogative it is, as parens patriae, to take care of persons who have lost their intellects. Nor is there any department of our government which has the right to exercise the duties and powers which belong, in England, to the prerogatives of the crown, unless those duties and powers have been conferred by statute."

For further elucidation of the general principle upon which the court, in Oakley v. Long, rested its ruling, see Green v. Allen, 5 Humph., 170; Ewell v. Sneed, 136 Tenn., 602, 191 S. W., 131, and Lewis v. Moody, 149 Tenn., 687, 261 S. W., 673.

The briefs in the instant case have inclined us to the opinion that learned counsel for complainant have failed to note the distinction between the jurisdiction of the county court in matters of probate of wills and grants of administration, in which it is a court of general jurisdiction, and its special and limited jurisdiction over some other matters, as, for example, an inquisition of lunacy, or a sale of land for the payment of debts. This distinction is pointed out in the cases of Towson v. Debow, 5 Sneed, 192, 195, and State, for use, etc., v. Anderson, 16 Lea, 321, 330-331.

Other cases, in addition to those already cited, which serve to illustrate the rule that the jurisdiction of the county court—that is, whether it is "general" or "special and limited"—depends upon the subject-matter of the particular case, are as follows: Brien v. Hart, 6 Humph., 130 (jurisdiction of the county court over the grant of administration is "general, exclusive and original");

Young v. Shumate, 3 Sneed, 369 (jurisdiction of county court over sales of property of decedents is "very limited in its extent"); Townsend v. Townsend, 4 Cold., 70, 79 (the jurisdiction of the county court over the probate of wills is "general, original and exclusive"); Bowers v. Lester, 2 Heisk., 456 (county court has no jurisdiction of suit against an administrator with will annexed to recover a legacy which the administrator claimed that he had paid. The court said: "The county court is one of limited and not general jurisdiction, and it has been the policy as well as the duty of the courts to confine it to such jurisdiction as the legislature in terms conferred, and not to enlarge by construction a jurisdiction out of which much ruinous litigation has already resulted;"); Crocker v. Balch, 104 Tenn., 6, 55 S. W., 307 (The county court is a court of general jurisdiction over matters pertaining to the adoption and legitimating of children).

It is asserted in one of the briefs in the instant case that, since the Code of 1858, there is no holding in our Supreme Court referring to the jurisdiction of the county court over the subjects embraced in sections 4201, 4202 and 4203 of the Code (Shannon 6027, 6029 and 6030) as being "special or limited." In this statement we think counsel are mistaken.

In Linnville v. Darby (1872), 1 Baxt., 304, at page 310, it is said that "the jurisdiction of the county court to sell land to pay debts is statutory; that the county court is not a court of general jurisdiction, and no presumption is made in its favor, or rather nothing shall be intended to be within its jurisdiction unless it so appear."

In Kindell v. Titus (1872), 9 Heisk., 727, 732, the court said that the jurisdiction of the county court to make sales of real estate, although concurrent with the circuit and chancery courts, "is a special and limited jurisdiction—statutory alone—and that we must look to the statute itself to ascertain its boundaries." The court (in Kindell v. Titus) declared "the true principle to be, that where the bill or petition alleges all the facts required by the statute, in order to sell the land; and the decree states these facts to have been made out to the satisfaction of the court, and assumes them as the basis and the ground on which the court orders the sale; that then in a collateral proceeding, seeking to attack the sale for the want of jurisdiction to make it, the evidence on which the court acted cannot be looked to—nor can the correctness of the conclusion at which the court arrived from that evidence, be investigated by another inferior court, in order to declare the decree thus made, valid or void."

In Puckett v. Wynns (1915), 132 Tenn., 513, 178 S. W., 1184, the court said (at page 526) that the proceeding there attacked (a sale of real estate to pay debts, under a decree of the county court,

on petition of the administrator of an insolvent estate) was "statutory and limited."

We do not find in either of the above cited three cases, nor in any others, a suggestion that the Code of 1858 had effect to make the county court a court of general jurisdiction over subjects concerning which its jurisdiction had theretofore been special and limited, or to change or modify the rule that in cases over which the jurisdiction of the court is special and limited, the jurisdictional facts must appear on the face of the record in order to render the decree or judgment immune from collateral attack. As said in Bond v. Clay, 2 Head, 378, with reference to sections 4204-4205 of the Code of 1858, "these sections, in our opinion, are merely declaratory of the law as it previously existed in regard to the jurisdiction of the county court upon the subject, without vesting in that tribunal any new or more extended power or authority."

It may be well to say that the case of Pope v. Harrison, 16 Lea, 82, upon which counsel place much emphasis, involved a collateral attack on judgments of the court of pleas and quarter sessions, which was a court of general common-law jurisdiction.

We are of the opinion, in the case now before us, that the jurisdiction of the county court of Wayne county over the persons and estates of persons of unsound mind was, and is, not general, but special and limited; that the decree of the county court here in question did not disclose the necessary facts to give the court jurisdiction to appoint a guardian for John Walker Brewer as a person of unsound mind; that said decree was therefore open to collateral attack in this cause, and that, upon the proof in the record, the said decree was and is wholly void and of no effect, and that the complainant James H. Brewer was and is without authority to maintain this suit.

Reference has been made in the briefs to the Act of 1919, chapter 17; but that is "An Act in relation to the insane to be known as the Insanity Law for the State Hospitals" etc., and manifestly has no application to this case. Moreover, the county court decree does not show a proceeding under that Act, and it is obvious that there was no inquisition pursuant to the provisions of said Act of 1919 (sec. 10) as a basis for the decree in question, and the application of that Act would not validate said decree.

It is insisted, on behalf of complainant, that this court has heretofore, in this case, (on petition for certiorari and supersedeas) held and adjudged that the decree of the county court in question is not open to collateral attack, and that such holding is now "the law of the case."

It is settled law that "whatever is once established between the same parties in the same case continues to be the law of the case,

whether correct on general principles or not, so long as the facts on which such decision was predicated continue to be the facts in the case." 15 R. C. L., p., 959. But "when a judgment establishes the law of the case, its effect as such extends only to the particular subject-matter then before the court." 15 R. C. L., p., 960; Railway Co. v. Mahoney, 89 Tenn., 311, 315-317, 15 S. W., 652.

After the pleadings in the instant case were filed, and before any proof was taken upon the issues, the Chancellor made an order directing the complainant to pay into court, out of the funds of John W. Brewer, on or before a day named, the sum of $750, and that the Clerk and Master should pay such sum, when received by him, over to the attorneys of record for John Walker Brewer, to be used on behalf of said John Walker Brewer as a fund to defray the expenses of properly defending this suit, including reasonable attorneys' fees. The complainant thereupon made application, by petition (accompanied by a transcript of the record) to this court for the writs of certiorari and supersedeas.

The complainant sought, by his petition, (1) the writ of certiorari to bring the case up to this court, and (2) to have this court supersede (a) the order of the chancery court permitting John Walker Brewer to file his intervening petition and become a defendant to the annulment suit, and (b) the order of the chancery court requiring complainant to pay into court the sum of $750 as aforesaid.

This court (1) denied the writ of certiorari; (2) declined to supersede the order permitting John Walker Brewer to intervene and become a defendant, and (3) granted a writ superseding the aforesaid order requiring the complainant to pay into court the sum of $750.

The supersedeas thus granted did not operate as a reversal of the order superseded, but merely suspended the operation thereof until the final hearing of the cause upon the issues made by the pleadings. See Shannon's Annotated Code, section 5737, and cases cited in Note 1, under that section. In other words, the fiat or decree of this court on the aforesaid petition of complainant went no further than to adjudge that complainant was not entitled to the writ of certiorari nor to have the order permitting John Walker Brewer to intervene as a defendant, superseded, but that the said order requiring complainant to pay the sum of $750 into court was one which it was not competent for the Chancellor to make in advance of a final hearing of the cause.

The transcript presented to this court, along with the petition for certiorari and supersedeas, did not contain a copy of the county court decree, as that decree had not been filed in the chancery court at that time, and any expressions in the written opinion of this

court, filed in response to the petition for certiorari and supersedeas, concerning the law governing a collateral attack on decrees of the county court, were necessarily obiter dicta, based merely upon averments in the pleadings; and the court said in the opinion, "we are not to be understood as passing upon the merits of the various contentions made by the pleadings." We are of the opinion that the Chancellor correctly interpreted the order of the court made on the petition for certiorari and supersedeas. Railway Co. v. Mahoney, supra.

Holding, as we do, that the county court decree purporting to appoint James H. Brewer to be guardian of John Walker Brewer as a person of unsound mind, was without authority of law and void, it follows that complainant James H. Brewer is without right to appeal from that part of the decree of the chancery court whereby it was adjudged that "the defendant John Walker Brewer was sane at the time of his marriage with his co-defendant, Gladys Griggs Brewer, and that said marriage was valid and binding in every respect, and wholly without fraud," and complainant's assignments of error which challenge the Chancellor's decree in that respect are, therefore, not well made. Harmon v. Harmon, supra.

Through an assignment of error, the complainant asserts that the Chancellor erred in overruling his exceptions to the testimony upon which the Clerk and Master based his report (later confirmed by order of the Chancellor) that $750 would be a reasonable and proper sum to be paid into court by complainant, out of the estate of John Walker Brewer to defray the expenses of John Walker Brewer in defending this suit, etc. This matter has become immaterial, for the reason that the order based on said testimony was, as before stated, superseded by this court, because, in view of the issues made by the pleadings, it was not competent for the Chancellor to make such an order in advance of the final hearing; and, on final hearing, no order was made on that subject, and, so far as appears, none was then sought. Presumably, the application for same was abandoned by the defendant John Walker Brewer.

Complainant also says, through an assignment of error, that "the court erred in adjudging the costs of this case against James H. Brewer individually for the reason that he was not a party to the suit individually and no valid judgment for costs could be rendered against him in his individual capacity."

We are of the opinion that this assignment of error is without merit, and it is overruled. Persons who bring an action without authority in the name of another are, as a general rule, held liable for costs. Note, 62 L. R. A., p., 623; Matter of Ryder, 11 Paige (N. Y.) 185, 42 Am. D. 109, 111.

402

Judge Gibson says:

"Costs in chancery, except as hereinafter shown" (referring to certain exceptions not applicable here), "are taxed against such party, or parties, as the court, in its discretion, may deem equitably liable therefor, in view of all the circumstances of the suit. The discretion exercised by the court in adjudging costs is not an arbitrary, capricious, blind discretion, but an equitable discretion, resulting from a consideration of the entire case, and all its circumstances, and the situation and conduct of the parties, in connection with the principles and practice in reference to the taxation of costs that have been acted on in analogous cases. The discretion of the court in adjudging costs is subject to review in the Supreme Court; but will not be reversed except in case of clear abuse." Gibson's Suits in Chancery (1 Ed.), section 564.

The record discloses nothing which, as we see it, indicates an abuse of the Chancellor's discretion in the adjudication of costs in this case.

It follows from our view of the facts of this case and the law applicable thereto, as hereinbefore stated, that all of the assignments of error are overruled and the decree of the chancery court dismissing complainant's bill at his cost is affirmed; and a decree will be entered accordingly.

James H. Brewer executed and filed an appeal bond both as guardian and individually, and the costs of the appeal will be adjudged against the complainant James H. Brewer individually and the sureties on his appeal bond.

Crownover and DeWitt, JJ., concur.